Judge Madeleine M. Landrieu
| gThis appeal arises from a dispute between Ms. Christina Bushman and Mr. James Knapp over the care, custody and parenting of their only child, Christopher. Specifically, Ms. Bushman has filed this appeal from a judgment of July 15, 2016 which, among other things, granted Mr. Knapp’s petition to be designated as Christopher’s domiciliary parent, held Ms. Bushman in contempt of court for her failure to allow Mr. Knapp his summer visitation, and held Ms. Bushman in contempt of court for conduct which served to dimmish the child’s love and affection for Mr. Knapp. Additionally, Ms. Bushman appeals the trial court’s denial of the rules for contempt she filed against Mr. Knapp for his failure to notify her when the child was not in his physical care overnight and for his failure to reimburse her for the minor child’s uncovered medical expenses. For the reasons that follow, we affirm the judgment of the trial court.
STATEMENT OF FACTS AND PROCEDURAL HISTORY
Mr. Knapp and Ms. Bushman were once involved a short-term dating relationship lasting several months, which resulted in the birth of the minor child, Christopher, on November 21, 2009. Ms. Bushman testified that she was five months pregnant before she learned that she was expecting and, by that time, she and Mr. Knapp were no longer dating. When Ms. Bushman learned of her [^pregnancy, she wrote to Mr. Knapp, who, at the time, was travel-ling in Europe, having recently graduated from college. She also contacted Mr. Knapp’s brother, Kyle, and asked that he contact Mr. Knapp directly to advise him of her pregnancy. Because of Ms. Bushman’s involvement with at least one other gentleman following the demise of their dating relationship, Mr. Knapp was not convinced that he was the father of the child. Shortly after the child was bom, but prior to his paternity being established, Mr. Knapp moved to North Carolina where he remained for several years.
In July 2010, when Christopher was eight months old, Ms. Bushman filed a Petition to Establish an Order of Child Support through the State of Louisiana. Paternity testing confirmed that Mr. Knapp was Christopher’s biological father. Thereafter, in January of 2011, while residing in North Carolina, Mr. Knapp filed a petition requesting that he and Ms. Bushman be awarded joint custody of Christopher, with Ms. Bushman being designated as the domiciliary parent. His petition also requested that he be granted reasonable visitation, and that co-parenting guidelines be established. When the matter came for hearing in March 2011, an Interim Judgment was entered granting *135 Mr. Knapp limited supervised visitation and ordering the parties to undergo drug testing.[1] An Interim Judgment was entered on June 13, 2011 wherein Ms. Bushman was awarded primary physical custody of Christopher and Mr. Knapp was granted periods of physical custody with the minor child in Louisiana with specific parameters regarding times and pick-up locations.[2] Additionally, the parties were ordered to participate in counseling with the Family Service of Greater New Orleans (with Mr. Knapp to | ¿participate by telephone) or, alternatively, to request that a parenting coordinator be assigned.
Within a month, Mr. Knapp and Ms. Bushman each commenced filing cross motions for contempt against one another for various alleged violations of the Interim Judgment.[3] On August 22, 2011, a Consent Judgment was entered resolving these various cross-motions. In that judgment, the parties agreed to the following: joint custody of Christopher with Ms. Bushman designated as the domiciliary parent; to abide by specifically enumerated co-parenting guidelines;[4] to | (¡participate in parenting classes and to provide a certificate of completion to the opposing party; to refrain from making derogatory remarks about the other parent (or family) in front of Christopher; a detailed physical custody plan and set visitation schedule for Mr. Knapp (who continued to reside in North Carolina); a designated exchange place and times; a set holiday and summer visitation schedule with each party agreeing to inform the other party within 30 days of their intention to take the child on vacation *136 and to provide a full itinerary, including but not limited to, flight and/or travel times, location, address, and telephone number of where the child would be staying; and, for the appointment of a parenting facilitator.[5]
Several months later, in October 2011, Mr. Knapp filed a motion to decrease child support and a motion for contempt alleging that Ms. Bushman made disparaging and derisive comments about Mr. Knapp in front of the minor child in violation of the co-parenting guidelines. Ms. Bushman responded by filing peremptory exceptions of no cause of action and prematurity, which the trial court sustained, dismissing Mr. Knapp’s motions on the basis that the Consent Judgment required Mr, Knapp to first present these issues to the parenting coordinator, which he failed to do.[6]
|fiWithin ten months, the parties were back in court. In August 2012, Ms. Bushman sought an increase in child support as well as to have the court appoint a new parenting facilitator to replace the former appointee, with whom Mr.' Knapp, feeling as if his concerns were not being adequately addressed, refused to participate. The following month, Mr. Knapp moved the court to modify the existing visitation schedule and to require Ms. Bushman to comply with the co-parenting guidelines by ceasing all negative and/or defamatory comments about him and/or his family. By judgment dated December 18, 2012, the trial court increased Mr. Knapp’s child support obligation in accordance with the Louisiana Child Support Guidelines and the parties’ respective incomes, having determined each parties’ pro rata share, with Ms. Bushman bearing 71% responsibility of the child support obligation and Mr. Knapp bearing the remaining 29%. With respect to medical expenses, the judgment provided the manner in which the parties would pay and be reimbursed for medical expenses incurred on behalf of Christopher.[7]
The judgment also ordered the parties to communicate via Our Family Wizard,[8] modified the summer vacation schedule, outlined the particulars regarding Mr. Knapp’s weekend visitation, and delineated the daily phone communication with the minor child by the parent not exercising physical custody. Additionally, the judgment assigned a new parenting coordinator and required that the parties meet with her prior to filing any pleadings in court,
|7Puring all of 2013 and the first eight months of 2014, no pleadings were filed by *137 either party.[9] In August 2014, however, Mr. Knapp requested a status conference alleging that Ms. Bushman arbitrarily refused to grant him summer visitation with Christopher despite his compliance with all notice and informational requirements. Then, in September 2014, Mr. Knapp filed a rule for contempt, modification of the child custody and/or domiciliary status, and requested sanctions. Specifically, Mr. Knapp averred that Ms. Bushman “manip-úlatela] the [December 18, 2012] judgment to her own advantage” by failing to recognize his joint custody rights, and “repeatedly interfer [ing] with [his] visitation rights.” Mr, Knapp alleged that Ms. Bushman wrongfully denied him the right to take the minor child for a scheduled out-of-state vacation. Mr. Knapp also averred that Ms. Bushman was in contempt based on the following: calling and involving the police in order to prevent his court-ordered visitation and without regard to the emotional impact upon the [then] four-year-old child; violating the co-parenting guidelines by refusing to inform him of Christopher’s fourth birthday party; repeatedly violating the co-parenting guidelines by making derogatory statements about Mr. Knapp within earshot and/or in the presence of the minor child, alienating the child’s affections for Mr. Knapp; and, refusing to co-parent to the detriment of the minor child. Mr. Knapp’s petition also alleged that his relocation from North Carolina to Louisiana constituted a material change in circumstances' warranting a modification of child custody. Specifically, Mr. Knapp requested co-domiciliary status and equal parenting time, both of which he averred were in Christopher’s best interest.
| sIn response, Ms. Bushman filed a motion to modify the physical custody plan to provide Christopher with a “more consistent physical custody plan during the regular months and a plan that does not involve [Mr.] Knapp having such extended periods of physical custody during the summer months.” Additionally, Ms. Bushman filed a rule to compel Mr. Knapp to undergo a mental health examination, to modify child support so as to have Mr. Knapp pay his pro rata share of all of the child care, school and extracurricular activities, and for contempt and sanctions. Ms. Bushman identified concerns regarding Mr. Knapp’s exhibition of “bizarre” behavior related to the practice of certain spiritual rituals (including the possibility of illicit drug use) and the potential impact these rituals may have upon Christopher. Ms. Bushman also expressed concerns related to Mr. Knapp’s purported history of memory lapses, poor retention skills and school-related problems that potentially compromise his ability to properly parent and discipline Christopher. Regarding the rules for contempt, Ms. Bushman alleged that Mr. Knapp was in violation of prior court orders by refusing to do the following: timely return Christopher to the designated exchange location; exercise Father’s Day visitation in 2013 and 2014; attend parenting classes and/or provide her with a certificate of completion of the court-ordered parenting classes; notify her of the child’s whereabouts when he is in Mr. Knapp’s care; communicate via Our Family Wizard; and, reimburse her for his pro rata share of extraordinary medical expenses incurred on behalf of the child.
■ A hearing was held on November 18, 2014, which resulted in a Consent Judgment that was signed on January 8, 2015. In this judgment, the parties agreed to the appointment of Dr. Alan James Klein as the custody evaluator, with the costs to be *138 split equally between the parties. The judgment also changed Mr. Knapp’s Invisitation to every other weekend from Friday afternoon until Monday morning.[10] Additionally, Mr. Knapp was ordered to inform Ms. Bushman of the child’s location in the event the child was not staying at Mr. Knapp’s home during his period of physical custody. All other pending matters were pretermitted pending the custody evaluation and further orders of the court.
Following the January 8, 2015 judgment, both parties filed various competing rules for contempt against one another. The trial on these multiple competing rules commenced on March 29, 2016 and lasted for three days, including June 15 and June 16, 2016. Also before the court were the parties’ competing rules for modification of custody and visitation. The parties were in agreement and stipulated that Mr. Knapp’s relocation from North Carolina to Mandeville, Louisiana in November 2013 constituted a material change in circumstances warranting a modification of their stipulated child custody decree.
Following the three-day trial, judgment was rendered on July 15, 2016 accompanied by written reasons. The trial court awarded joint custody of the minor child to Mr. Knapp and Ms. Bushman and designated Mr. Knapp as the primary domiciliary parent. The court further ordered that the child be enrolled in school in Mande-ville. Ms. Bushman was granted physical custody of the child every other weekend from Friday after school until Sunday evening at 6:00 p.m., and it was stipulated that the party receiving custody of Christopher was responsible for providing transportation. Ms. Bushman was also awarded two nonconsecutive two-week periods of uninterrupted summer visitation and was ordered to provide Mr. Knapp with no less than 30 days’ notice of her intent to exercise |1flsummer visitation. Each party was granted physical custody of Christopher on their own respective birthdays, and the parties were to alternate physical custody of Christopher on his birthday, with Mr. Knapp having custody in the even-numbered years and Ms. Bushman having custody during the odd-numbered years. All other holiday visitation was to remain as previously ordered in the August 2011 Consent Judgment. The judgment further ordered that the parent not exercising physical custody of Christopher was to be given a right of first refusal in the event the parent with physical custody is unable to care for Christopher for a period in excess of 24 hours.
With respect to the competing rules for contempt, the July 15, 2016 judgment granted Mr. Knapp’s rule for contempt for Ms. Bushman’s failure to allow summer visitation, but denied his rule for contempt for her failure to pay Dr. Klein’s custody evaluator fees.[11] Mr. Knapp’s rule for contempt for Ms. Bushman’s failure to abide by the co-parenting guidelines was granted insofar as it related to Ms. Bushman’s attempt to diminish Christopher’s love and affection for Mr. Knapp, but was denied as it related to her failure to provide information. Ms. Bushman was also ordered to pay Mr. Knapp’s court costs and attorney’s fees for her contempt. Ms. Bushman’s rule for contempt against Mr. Knapp for his failure to reimburse her for uncovered medical expenses was denied, as was her *139 rule for contempt for his failure to notify her when Christopher does not spend the night at his home.[12]
It is from the July 15, 2016 judgment that Ms. Bushman appeals.
|nIn this appeal, Ms. Bushman assigns as error that the trial court abused its discretion: (1) by granting Mr. Knapp’s rules for contempt for her failure to allow his summer vacation and ordering her to pay the associated court costs and attorney’s fees, and for her diminishment of the child’s love and affection for him; (2) by denying her rules for contempt against Mr. Knapp for failing to reimburse her for Christopher’s uncovered medical expenses in violation of the December 12, 2012 judgment, and for failing to notify her when the child did not spend the night at his home in violation of the January 8, 2015 consent judgment; and (3) in granting domiciliary status to Mr. Knapp claiming that this change is not in Christopher’s best interests and could potentially cause the child harm.
LAW AND ANALYSIS
I. Standard of Review

A.Contempt of Court

Appellate courts review a trial court’s finding of contempt by a manifestly erroneous standard. Jaligam v. Pochampally, 14-0724, p. 5 (La. App. 4 Cir. 2/11/15), 162 So.Sd 464, 467. A trial court is vested with great discretion in determining whether circumstances warrant holding a party in contempt pursuant to the constructive contempt statute for willful disobedience of a judgment or order of the court. La. C.C.P. art. 224(2); South East Auto Dealers Rental Ass’n, Ine. v. EZ Rent To Own, Inc., 09-0011, p. 8 (La. App. 4 Cir. 6/30/10), 42 So.3d 1094, 1099.

B.Child Custody Determinations

| iaChild custody determinations are reviewed under the abuse of discretion standard, Leard v. Schenker, 06-1116, p. 3 (La. 6/16/06), 931 So.2d 355, 357. Thus, “the determination of the trial judge in a child custody matter is entitled to great weight and his discretion will not be disturbed on review in the absence of a clear showing of abuse.” Id. at pp. 3-4, 931 So.2d at 357 (quoting AEB v. JBE, 99-2668, p. 7 (La. 11/30/99), 752 So.2d 756, 761.
In most child custody cases, the trial court’s rulings are based heavily on its factual findings. Hanks v. Hanks, 13-1442, p. 8 (La. App. 4 Cir. 4/16/14), 140 So.3d 208, 214 (citing Palazzolo v. Mire, 08-0075, pp. 34-37 (La. App. 4 Cir. 1/7/09), 10 So.3d 748, 768-70). “[A] court of appeal may not set aside a trial court’s or a jury’s findings of fact in the absence of ‘manifest error’ or unless it is ‘clearly wrong.’ ” Evans v. Lungrin, 97-0541, 97-0577, p. 6 (La. 2/6/98), 708 So.2d 731, 735 (citing Rosell v. ESCO, 549 So.2d 840, 844 (La. 1989)).
“Every child custody case must be viewed based on its own particular facts and relationships involved, with the goal of determining what is in the best interest of the child.” Mulkey v. Mulkey, 12-2709, p. 15 (La. 5/7/13), 118 So.3d 357, 367; see La. C.C. art. 131 (providing that “the court shall award custody of a child in accordance with the best interest of the child”). In determining the best interest of the child, “[e]ach case must be viewed in light of the child’s age, the situation of the parents, and any other factor relevant to *140 the particular case.” Palazzolo, 08-0075 at p. 35,10 So.3d at 768.
Because the trial judge is in a better position to evaluate the best interest of a child from his superior position to observe and evaluate the demeanor and credibility of the parties and the witnesses, his decision will not be disturbed on review absent a clear showing of abuse. Smith v. Smith, 07-0260, 07-0261, p. 4113(La. App. 4 Cir. 2/13/08), 977 So.2d 1114,1116-17; Pa-lazzolo, 08-0075 at p. 35, 10 So.3d at 768; Foshee v. Foshee, 12-1358, p. 4 (La. App. 4 Cir. 8/28/13), 123 So.3d 817, 820; Watts v. Watts, 08-0834, p. 2 (La. App. 4 Cir. 4/8/09), 10 So.3d 855, 857. As this court recently noted in Jaligam v. Pochampally, 16-0249, p. 6 (La. App. 4 Cir. 12/7/16), 206 So.3d 298, 303, “the court of appeal cannot simply substitute its own findings for that of the trial court.” See also, Mulkey, 12-2709, p. 16,118 So.3d at 368.
II. Contempt Issues
Contempt of court is defined in Article 221 of the Louisiana Code of Civil Procedure as “any act or omission tending to obstruct or interfere with the orderly administration of justice, or to impair the dignity of the court or respect for its authority.” There are two types of contempt of court, direct and constructive. La. C.C.P. art. 221. Louisiana Code of Civil Procedure article 222 defines direct contempt of court as “one committed in the immediate view and presence of the court and of which it has personal knowledge, or a contumacious failure to comply with a subpoena or summons, proof of service of which appears of record.”
A constructive contempt of court is defined in Louisiana Code of Civil Procedure article 224 as “any contempt other than a direct one.” Willful disobedience of any lawful judgment constitutes a constructive contempt of court. La. C.C.P. art. 224(2). A court’s finding that a person willfully disobeyed a lawful judgment in violation of La. C.C.P. art. 224(2) must be based on a finding that the accused violated an order of the court “intentionally, purposely, and without justifiable excuse.” Burst v. Schmolke, 10-1036, p. 6 (La. App. 4 Cir. 4/6/11), 62 So.3d 829, 833 (citing Lang v. Asten, Inc., 05-1119, p. 1 (La. 1/13/06), 918 So.2d 453, 454). The trial court is vested with great discretion in determining whether a |14party should be held in contempt for disobeying a court order and the court’s decision should be reversed only when the appellate court discerns an abuse of that discretion. Id.
On appeal, Ms. Bushman seeks reversal of four of the trial court’s rulings on contempt and a reversal of the imposition of sanctions against her. We address each ruling separately.
A. Failure to Allow Summer Visitation and the Imposition of Sanctions
Ms. Bushman contends the trial court manifestly erred in its determination that she willfully disobeyed the August 22, 2011 Consent Judgment regarding visitation by failing to allow Mr. Knapp to exercise his summer vacation and abused its discretion in holding her in contempt of court based on that finding. We disagree. The applicable provision in the judgment provides, in pertinent part:
James Knapp may have physical custody of the minor child for three (3) consecutive weeks and may take the child out of the State of Louisiana for vacation. ... Both parties must inform the other party within thirty (30) days of their intention to take the child on vacation and must provide the other party with a full itinerary, including but not limited to flight and/or travel times, location, ad *141 dress, and telephone numbers of where they will be staying[.]
At trial, both parties testified that Mr. Knapp advised Ms. Bushman of his intent to exercise his summer visitation twenty-nine (29) days in advance, rather than the thirty (30) days required by the Consent Judgment. Despite his being one day late, Ms. Bushman initially consented to the proposed out-of-town vacation confirming the following in an email to Mr. Knapp: “Although the 25th through the 1st is not within the 30 day guidelines as per court order, those dates work out better for me.” Mr. Knapp testified that he had planned a camping trip to Indiana for Christopher and himself and had provided Ms. Bushman with “all of the |1r,details” and information, including “what he’d be doing ... [a]ddresses, phone numbers and all the information [the] Judge requires [he] give” regarding the vacation, but that five days prior to their scheduled departure, Ms. Bushman revoked her consent and refused to allow Christopher to make the trip. Consequently, Mr. Knapp was not allowed to exercise his visitation with Christopher.
When asked at trial why she refused to allow the scheduled vacation, contrary to Mr. Knapp’s testimony, Ms. Bushman testified that she kept asking Mr. Knapp to provide her .with an adequate itinerary and details of the trip as required by the Consent Judgment and because he refused to do so, she revoked her consent. According to Ms. Bushman, Mr. Knapp’s failure to provide the necessary itinerary information constituted a violation of the Consent Judgment. The trial court obviously did not credit her testimony.
In her reasons for judgment, the trial judge stated:
The testimony and evidence indicated that, despite Mr. Knapp’s failure to provide proper notice, Ms. Bushman agreed to the proposed summer visitation and then revoked her consent less than a week before the planned vacation. Because Ms. Bushman consented to Mr. Knapp’s summer visitation and then revoked her consent a few days prior to that visitation, the Court finds her in contempt for failure to allow summer visitation.
In essence, the trial court was confronted with two conflicting versions of the events leading up to the scheduled vacation and the reasons for its last minute cancellation. As to Mr. Knapp providing only 29 days’ notice of his intent to exercise his summer vacation instead of the required 30-day notice, the trial court held that because Ms. Bushman agreed to it, this delay was not the gravamen of her complaint and not the reason why she revoked her consent. Ms. Bushman | ^acknowledged as such. The real dispute before the court was whether Mr. Knapp timely provided to Ms. Bushman the details of the visitation as required by the judgment. The trial court apparently chose to accept as true Mr. Knapp’s testimony that he provided Ms. Bushman with all of the necessary information regarding the trip over that of Ms. Bushman, who claimed that he did not.
It is well settled that because the trial judge, as fact finder, is best aware of the variations in the demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said, when a conflict exists in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Rosell, 549 So.2d at 844; Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978). The reviewing court must always keep in mind that “if the trial court or jury’s findings are reasonable in light of the record *142 reviewed in its entirety, the court of appeal may not reverse, even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.” Sistler v. Liberty Mutual Insurance Co., 558 So.2d 1106, 1112 (La. 1990). Consequently, when there are two permissible views of the evidence, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong. Sistler, supra at 1112.
Applying these legal precepts to the limited, conflicting testimony elicited at trial regarding the summer vacation, we cannot say the trial court was manifestly erroneous or clearly wrong in accepting as true Mr. Knapp’s testimony that he did, in fact, provide Ms. Bushman with all of the necessary information required by the Consent Judgment. After reviewing the record, we are satisfied that Mr. Knapp’s testimony establishes a “reasonable factual basis” for the trial court’s finding that |17Ms. Bushman willfully disobeyed the August 2011 Consent Judgment and was in constructive contempt of court when she initially agreed to allow Mr. Knapp to exercise his summer visitation with the minor child, and then revoked her consent only days before the scheduled departure, thereby denying Mr. Knapp of his summer visitation.
Ms. Bushman further challenges the July 15, 2016 judgment insofar as it ordered her to pay Mr. Knapp’s attorney fees and costs associated with her contempt. Title 9 of the Louisiana Revised Statutes, Section 346, governs actions against a parent for his or her failure to allow visitation pursuant to the terms of a court-ordered schedule. According to the statute, when the petitioner prevails in an action against the defendant for failure to allow visitation pursuant to a court-ordered schedule, “the defendant shall be held in contempt of court and the court shall award to the petitioner ... all attorney fees and costs of the proceedings.” See La. R.S. 9:346(0(3). Title 13 of the Louisiana Revised Statutes, Section 4611, also provides the punishment that a court may impose upon a parent adjudged guilty of contempt of court for violating a visitation order, including the payment of “all court costs and reasonable attorney fees of the other party.” La. R.S. 13:4611(l)(e)(iv). Having determined the trial court did not err in adjudging Ms. Bushman guilty of contempt for violating the August 22, 2011 consent judgment by refusing to allow Mr. Knapp to exercise his court-ordered visitation, we likewise find that it was not an abuse of the trial court’s discretion to impose sanctions in the form of attorney fees and costs upon Ms. Bushman pursuant to La. R.S.9:346(C)(3) and 13:4611(l)(e)(iv). This assignment of error is without merit.
B. Failure to Abide by the Co-Parenting Guidelines
11sMs. Bushman appeals the July 15, 2016 judgment insofar as it adjudges her guilty of contempt for failing to abide by the co-parenting guidelines due to her diminishment of the child’s love and affection for Mr. Knapp. According to Ms. Bushman, the evidence presented at trial does not support the trial court’s finding that she constantly demeaned or made derogatory remarks about Mr. Knapp in front of the child.
The co-parenting guidelines set forth in the August 22, 2011 Consent Judgment prohibit the parties from saying or doing anything in the presence or hearing of the child that would in any way diminish the child’s love or affection for the other parent. In its reasons for judgment, the trial court found “[t]he testimony given at trial overwhelmingly contradicts Ms. Bushman’s assertion that she has never attempted to diminish Christopher’s love or *143 affection for Mr. Knapp.” After an extensive review of the trial court testimony and exhibits contained in the record, we agree.
On appeal, Ms. Bushman argues that the record contains only one instance, to which she admitted, of her making a derisive remark about Mr. Knapp in front of the child, and that this one instance does not rise to a level warranting the trial court’s finding of contempt. Specifically, Ms. Bushman admits that she told the child that it was “time [for him] to go with the bad people,” referring to Mr. Knapp and his mother, Mary Grace Knapp. Admitting her mistake as to that one occasion, Ms. Bushman explained that the demeaning statement was a result of her “emotional state of frustration” with Mr. Knapp at that time. Ms. Bushman further admitted to making derogatory statements in emails to Mr. Knapp, but denies that the child ever saw those emails or claims that, even if he did, given his age, he would not have been able to read them. Further, Ms. Bushman avers that because |19the alleged “vitriolic behavior,” about which Mr. Knapp complains, was exhibited by and between both parties, the trial court erred in finding her in contempt for such behavior.
While it is clear from a review of the trial testimony that indeed an acrimonious and vitriolic relationship exists between the parties, it is not clear that Mr. Knapp has intentionally or purposely demeaned and/or degraded Ms. Bushman in front of their son.[13] The same cannot be said regarding Ms. Bushman. The record is replete with examples of her casting verbal aspersions toward Mr. Knapp in the presence of the child sufficient to establish that she repeatedly violated the co-parenting guidelines, including the following:
• Mr. Knapp described several occasions where Ms. Bushman verbally assailed him over the phone (or “bad-mouthed” him over the phone to his mother) while Christopher was present;
• While attending a family wedding with the child in Niagara Falls, Christopher told family members that Ms. Bushman had instructed him to tell Mr. Knapp’s family members that they “suck.”
• Following the unfavorable court hearing allowing Christopher to attend the out-of-town wedding, Mr. Knapp testified that Christopher told him he heard Ms. Bushman say that she could “shoot the judge;”14
• While attempting to discuss with Ms. Bushman the possibility of Christopher joining him for his birthday celebration, Ms. Bushman responded by telling him to “shut up.” Christopher was present and witnessed this acerbic exchange;
bn* During a transfer/exchange of Christopher at a Wendy’s restaurant following a miscommunication between the parties regarding the exact pick-up time, Ms. Bushman was verbally aggressive towards Mr. Knapp in front of the child and began to verbally berate his girlfriend, who had accompanied him to
*144 the Wendy’s (and who was videoing the exchange on her cell phone).[15]
• Christopher has told both Mr. Knapp and his grandmother, Mary Grace Knapp, that his mother hates them.
• While Mr. Knapp was speaking with his son on a speakerphone, he heard Ms. Bushman express t'o Christopher that his “daddy still doesn’t have his shit together.”
• On several occasions, Ms. Bushman has involved the police, usually during a transfer/pick-up/exchange of Christopher or during Mr. Knapp’s visitation with Christopher. Christopher has been present for these unfortunate encounters.
Additionally, introduced into evidence at trial were a series of email exchanges between Mr. Knapp and Ms. Bushman via Family Wizard and several text messages, most of which are laced with profanity and contain demeaning, insulting, pejorative accusations and statements made by Ms. Bushman to Mr. Knapp. According to Mr. Knapp, the tone, demeanor .and language with which Ms, Bushman communicates via Family Wizard (and through text messaging) is consistent with the tone, demeanor and language she uses to communicate with him in person and in front of Christopher.
The trial judge also heard testimony from Mr. Knapp’s brother, Kyle, and his mother, Mary Grace. Kyle testified as to occasions where he has personally witnessed Ms. Bushman verbally attack his brother in Christopher’s presence, | a, especially relating to punctuality. According to Kyle, it is because of the ongoing demeaning and belittling behavior Ms. Bushman exhibits towards his brother that their own relationship, which used to be amicable, has deteriorated. Kyle testified that he is leery about communicating with Ms. Bushman because she routinely speaks negatively about his brother and other family members.
Similarly, Mary Grace Knapp testified that she has repeatedly witnessed Ms. Bushman degrade and belittle her son in front of Christopher. Mary Grace stated that she has attempted to impress upon Ms. Bushman the damage she has caused by alienating Christopher against his father through her negative actions and the “use of derogatory, abusive and inflammatory words” when communicating with Mr. Knapp in front of Christopher, to no avail On one occasion, Mary Grace sent Ms. Bushman a letter expressing her ongoing concerns, and Ms. Bushman took offense to her observations and suggestions. According to .Mary Grace, Christopher has expressed to her his understanding that his mother hates his father. Both Kyle and Mary Grace corroborated Mr. Knapp’s testimony that Christopher sometimes acts negatively towards them, which they believed to be a result of the derisive attitude Ms. Bushman exhibits in front of Christopher toward the Knapp family.
Based upon our review of the evidence contained in the record and the testimony of the parties and the witnesses, we cannot say the trial judge manifestly erred or was clearly wrong in finding that Ms. Bushman intentionally, purposely, and without justifiable excuse violated the co-parenting guidelines, and did so repeatedly. This assignment of error also lacks merit.
C. Failure to Notify Ms. Bushman of Christopher’s Visitation Location
|22Ms. Bushman appeals the trial court’s denial of her rule for contempt *145 against Mr. Knapp in which she alleges that Mr. Knapp failed to comply with the November 18, 2014 Consent Judgment, which required him to notify Ms. Bushman of the child’s location if the child would not be spending the night with him. According to Ms. Bushman, the reason this language was included in the Consent Judgment was because Mr. Knapp had a history of not spending the night with Christopher during his weekend visitations and not -informing her as to where her son was sleeping. To the contrary, however, Ms. Bushman’s own trial testimony confirms that she was well aware that Christopher routinely slept at his grandmother’s house at least one night during Mr. Knapp’s visitation weekends and that she did not have a problem with him doing so. Further, Ms. Bushman conceded that Mr. Knapp does apprise her at least 90% of the time of the nights that Christopher stays with his grandmother.
In denying Ms. Bushman’s rule for contempt, the trial court stated in its written reasons that Ms. Bushman failed to provide “evidence that Mr. Knapp’s occasional failure to notify her of Christopher’s regular, overnight visit with his grandmother was willful.” Ms. Bushman argues the trial court erroneously “added the requirement of willfulness” into the Consent Judgment. We find Ms. Bushman’s argument is misplaced because, by definition, in order to constitute a constructive contempt of court, one must establish the accused’s “willful disobedience” of a lawful judgment. See La. C.C.P. art. 224(2). Moreover, as a predicate to finding a party guilty of contempt for willfully disobeying a court order, the trial court must find the accused violated the order “intentionally, purposely, and without justifiable excuse.” Burst, 10-1036, p. 6, 62 So.3d at 833. The record supports the trial court’s finding that Ms. Bushman failed to prove thatlasMr. Knapp willfully disobeyed the Consent Judgment by occasionally failing to notify her when Christopher spent the night at his grandmother’s home located only a few houses down from Mr. Knapp’s home. Accordingly, this assignment of error is also without merit.
D. Failure to Reimburse Ms. Bushman for Uncovered Medical Expenses
Ms. Bushman argues the trial court manifestly erred when it denied her rule for contempt filed against Mr. Knapp for his failure to reimburse her for his pro rata share of Christopher’s uncovered medical expenses in violation of the December 18, 2012 judgment. The judgment sets forth Mr. Knapp’s obligation as follows:
IT IS ORDERED, ADJUDGED and DECREED that James Knapp must pay his pro rata share of any non-covered medical, dental and psychological expenses after Christina Bushman has paid the first $250.00 per calendar year. Christina Bushman must provide’a copy of the expense (statement, receipt or cancelled checks) in writing to James Knapp within thirty (30) days of incurring the expense or she waives the reimbursement claim for the expense. James Knapp must reimburse Christina Bushman for his pro rata share (29%) of the expense within thirty (30) days of receiving a copy of the expense.
In the July 15, 2016 judgment from which Ms. Bushman appeals, the trial court held: “IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Ms. Bushman’s Rule for Contempt for Mr. Knapp’s failure to reimburse her for uncovered medical expenses is denied.” In its reasons for judgment, the trial court stated that “[ajlthough she testified that she provided proof of these expenses to Mr. Knapp by attaching receipts and bills *146 to Our Family Wizard communications, the evidence presented does not support Ms. Bushman’s claims for reimbursement.”
|?4It is well settled that a trial court’s “oral or written reasons for judgment form no part of the judgment and that appellate courts review judgments, not reasons for judgment.” Wooley v. Lucksinger, 09-0571, p. 77 (La. 4/1/11), 61 So.3d 507, 572, citing Bellard v. American Cent. Ins. Co., 07-1335, p. 25 (La. 4/18/08), 980 So.2d 654, 671; Greater New Orleans Expressway Commission v. Olivier, 02-2795, p. 3 (La. 11/18/03), 860 So.2d 22, 24 (“Appeals are taken from the judgment, not the written reasons for judgment”); La. C.C.P. arts. 1918, 2082 and 2083. Judgments are often upheld on appeal for reasons different from those assigned by trial court judges. “The written reasons for judgment are merely an explication of the trial court’s determination. They do not alter, amend, or affect the final judgment being appealed ...” Wooley, 09-0571 at pp. 77-78, 61 So.3d at 572, citing State in the Interest of Mason, 356 So.2d 530, 532 (La. App. 1 Cir. 1977).
Against this legal backdrop, we find no error in the trial court’s judgment denying Ms. Bushman’s rule for contempt against Mr. Knapp for failing to reimburse her for his share of the uncovered medical expenses. However, we note that the trial court, in its reasons for judgment, mistakenly referred to Ms. Bushman’s claim as a claim for reimbursement. It was not. The issue of whether reimbursement was owed (and, if so, the amount owed), was not before the trial court and is, thus, not before this court. The issue before the trial court was whether Mr. Knapp should be found in contempt for failing to pay. In this regard, the record indicates that Ms. Bushman failed to carry her burden of proof to establish that Mr. Knapp intentionally violated the judgment by failing to pay his share of the expenses.
|25Ms. Bushman testified at trial regarding various medical and dental expenses she apparently incurred on behalf of Christopher between 2013 and 2015. She further testified that she timely submitted these expenses to Mr. Knapp via Our Family Wizard and that he failed to reimburse her. The record on appeal, however, is devoid of sufficient evidence of the actual “statements], receipts], or cancelled check[s]” required by the judgment to substantiate that these expenses were incurred or timely presented to Mr. Knapp.[16] Additionally, Ms. Bushman failed to submit evidence establishing that she had paid the first $250.00 as required by the judgment in the years 2013, 2014 and 2015. In the absence of sufficient proof on the record, we cannot say the trial court was wrong in denying Ms. Bushman’s rule for contempt against Mr. Knapp.[17]
*147 III. Child Custody and Domiciliary Status
The parties have stipulated that Mr. Knapp’s move from North Carolina to Louisiana when Christopher was four years old constituted a material change in 12ficircumstances warranting a review of the considered custody decree. In addition, the trial judge found that “Ms. Bushman’s continued contemptuous behavior also constitutes a material change in circumstances” meriting a modification of custody. The one thing—arguably, the only thing—upon which both parties and all witnesses can seem to agree, is that the acrimonious relationship between Mr. Knapp and Ms. Bushman is in need of significant improvement before its ill effects are visited upon their now eight-year-old son. In an effort to initiate and sustain this improvement, finding it to be in Christopher’s best interest, the trial court modified the prior child custody award by granting domiciliary status of the child to Mr. Knapp.
On appeal, Ms. Bushman asserts the trial court abused its discretion by designating Mr. Knapp as the domiciliary parent on the following grounds: (1) Mr. Knapp has, until recently, been largely uninvolved in Christopher’s life; and (2) based on the court-appointed custody evaluator’s testimony, because Christopher is more closely bonded to his mother, a change in domiciliary status may potentially generate emotional harm.
Mr. Knapp counters that the trial court’s decision awarding him domiciliary status was not an abuse of discretion, but rather, was made after the trial judge “patiently listened to each witness, considered each piece of evidence introduced and accepted, and reviewed and considered the very lengthy record, after presiding over nearly four (4) years of acrimonious litigation.” Accordingly, Mr. Knapp avers the judgment should be affirmed.
In its written reasons for judgment addressing the change in domiciliary status, the trial court stated:
127Based on the testimony and the evidence presented, the Court finds a material change in circumstances has occurred as a result of Mr. Knapp’s move back to Louisiana and Ms. Bushman’s continued violation of the co-parenting guidelines. Mr. Knapp now lives approximately 35 miles away from New Orleans and has been able to spend more time with Christopher than when he lived in North Carolina. Ms. Bushman has demeaned and belittled Mr. Knapp in Christopher’s presence for years, despite being bound by the co-parenting guidelines and being cautioned numerous times to refrain from this behavior. Both parties love Christopher and have demonstrated a strong bond with him. After careful consideration of the best interest factors, the Court finds that it is in Christopher’s best interest that the parties continue to enjoy joint custody, but that Mr. Knapp should be granted domiciliary status. Dr. Klein informed Ms. Bushman in 2015 that Christopher should not be sleeping with her in her bed, but Christopher has yet to consistently sleep on his own while in her care. Ms. Bushman expressed little concern *148 over Christopher’s consistent absences from school and made no efforts to get him to school when she was ill. She has been unemployed for nine months and will soon be unable to provide Christopher with financial support. She has also refused to foster a relationship between Christopher and his father, despite Mr. Knapp’s efforts to ensure Christopher continues to love Ms. Bushman. Mr. Knapp has demonstrated his ability to provide a stable environment for the child and a willingness to continue to encourage a close relationship between Christopher and Ms. Bushman. For these reasons, the Court finds that it is in the best interest of the minor child to reside primarily with his father.
Initially, we note that an appeal lies from the judgment itself, not the reasons for judgment. La. C.C.P. art. 2083. Moreover, as stated previously, each child custody case must be viewed in light of its own particular set of facts and circumstances, with the paramount goal of reaching a decision that is in the best interest of the child. See McCormic v. Rider, 09-2584, p. 3 (La. 2/12/10), 27 So.3d 277, 279.
IgaTo aid courts in making the factual determination regarding the best interest of the child, Louisiana Civil Code article 134 enumerates twelve factors for the court to consider. These factors have been construed to be nonexclusive, and the trial court has the discretion to determine the relative amount of weight to be given each factor. The court is not required to analyze mechanically all of the dozen factors; rather, the court should balance and weigh the factors in light of the evidence presented. Hanks, 13-1442 at pp. 9-10, 140 So.3d at 215. The best-interest-of-the-child standard codified in La. C.C. arts. 131 and 134, which standard governs the issue of whether the trial court erred in this case by changing the domiciliary parent from Ms. Bushman to Mr. Knapp, is a “fact-intensive inquiry requiring the weighing and balancing of factors favoring or opposing custody in the competing parties on the basis of evidence presented in each case.” Lannes v. Lannes, 07-0345, p. 4 (La. App. 4 Cir. 2/13/08), 977 So.2d 1119, 1121. In reaching its decision in the case sub judice, the trial court, in its reasons for judgment, addressed the application of each of the Article 134 factors. We summarize the trial court’s findings as follows:
(1) The love, affection, and other emotional ties between each party and the child.
The tidal court noted that both parties established their love for Christopher. Because of Mr. Knapp’s move to North Carolina shortly after the child’s birth, Ms. Bushman was the primary caregiver for the first seven years of Christopher’s life and is bonded to the child. The court expressed concerns that the child, almost seven years old at the time of trial, continues to regularly sleep with his mother despite Ms. Bushman having been admonished that this arrangement is not healthy for the child. The court also noted that Mr. Knapp, though he admittedly did not Lohave much involvement with the child in the first years of Christopher’s life, since returning to Louisiana (when Christopher was four years old), has been an active participant in Christopher’s life, and the two now share a strong bond. Based on her role as Christopher’s primary caregiver since birth and Mr. Knapp’s lengthy absence from Christopher’s early life, the trial court determined that this factor weighed in Ms. Bushman’s favor.[18]
*149 (2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.
The trial court noted that both parties clearly love their son. The court also noted that Mr. Knapp tends to be more spiritual than religious[19] and desires to expose Christopher to diverse cultures. The court also found that he places more emphasis on social consciousness and physical fitness than does Ms. Bushman. The court further noted that Mr. Knapp appeared more concerned about Christopher’s education than Ms. Bushman, and that she seemed unconcerned about an excessive number of school absences in the previous school year and the potential impact upon Christopher’s education. The trial court concluded that this factor weighed in Mr. Knapp’s favor because Ms. Bushman has failed to consider how Christopher’s school attendance may impact his future, and Mr. Knapp has demonstrated a desire to enhance Christopher’s education through cultural exposure, socially conscious behaviors, and consistent school attendance.
Ian (3) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.
The trial court concluded that while both parties were providing for Christopher’s needs at the time of trial, and both expressed a willingness to continue to do so, due to Ms. Bushman’s self-imposed unemployment and longstanding accumulated debt, her financial situation does not allow for Christopher’s long-term support. Further, because the evidence established that Mr. Knapp has stable employment and, consequently, is better able to provide for Christopher’s needs long term, the trial court determined this factor “weighs heavily in favor of Mr. Knapp.”
(4) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.
The trial court noted that, other than during visitation, Christopher has lived with his mother the whole of his life, and for the five years preceding trial, had lived with her in the same house. The evidence established that, while living with Ms. Bushman, Christopher has had excessive school absences. Mr. Knapp expressed concern regarding the impact these absences can have on Christopher’s education. Despite Christopher having lived the majority of his life with his mother, due to Ms. Bushman’s lack of concern for Christopher’s education, the trial court determined from the evidence presented that maintaining this environment is not desirable and found this factor weighed in Mr. Knapp’s favor.
(5) The permanence, as a family unit, of the existing or proposed custodial home or homes.
|s1The court noted that Christopher has resided with his mother his entire life. Ms. Bushman’s family unit consists of herself and Christopher, as well as friends she considers family; her extended family lives elsewhere. Mr. Knapp’s family unit consists of himself, Christopher, his two brothers, his mother and grandmother, all of whom have resided near each other in *150 Mandeville all of Christopher’s life.[20] The evidence suggests Mr. Knapp’s family unit is close-knit and is a viable support system to him and Christopher. Mr. Knapp’s mother and grandmother live in houses located on the same block as Mr. Knapp’s house. While Ms. Bushman described her friends as her support system, the trial court noted that she failed to demonstrate that she has used them in time of need. Accordingly, the trial court concluded that, based on the evidence presented, because Mr. Knapp has a stronger and more permanent support system locally and because, unlike Ms. Bushman, he utilizes his support system in times of need, this factor weighed in his favor.
(6)The moral fitness of each party, insofar as it affects the welfare of the child.
The trial court noted that both “parties’ use of derogatory language toward one another speaks to their moral fitness.” Ms. Bushman’s communications to Mr. Knapp are rife with profanity and are demeaning to him and his family. She has been admonished by both the trial court and the court-appointed custody evaluator to co-parent and be less reactive. The trial testimony suggests that Mr. Knapp exhibits passive-aggressive behavior towards Ms. Bushman that contributes to her reactivity. The trial court acknowledged Mr. Knapp’s passive aggressive behavior, |32but determined Ms. Bushman’s ongoing use of profanity to be more concerning and detrimental to Christopher. Further, the trial court noted that Ms. Bushman shows a tendency to withhold the whole truth, whereas the veracity of Mr. Knapp was not called into question. Both parties testified that Christopher lies or has lied in the past. Based upon Ms. Bushman’s “perpetual negativity” toward Mr. Knapp and his family and her withholding information in important situations, the trial court concluded this factor weighed in favor of Mr. Knapp.
(7) The mental and physical health of each party.
Based upon the evidence presented showing that Ms. Bushman, aged 45 at the time of trial, and Mr. Knapp, aged 30, both are in good physical and mental health, the trial court concluded this factor to be “neutral.”
(8) The home, school, and community history of the child.
The trial court determined that this factor weighed in favor of Mr. Knapp based on the evidence establishing that “[t]hough [he] has resided with his mother in New Orleans for his whole life, Christopher’s home, school, and community history suggests instability and inconsistency in his school and lack of involvement with extended family,” and “Ms. Bushman continues to sleep with the minor child against expert advice.” In finding this factor weighed in Mr. Knapp’s favor, the court also considered evidence establishing that Mr. Knapp encourages Christopher to sleep in his own room and that “there is a stable, dependable community available to [Christopher] in Mandeville.”
Ian (9) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.
At the time of trial, Christopher was about six-and-a-half years old, and the court concluded he was not of a sufficient age to express his preference under this factor. Therefore, the trial court did not consider this factor.
*151 (10) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party.
The trial court noted that Ms. Bushman is unwilling to foster a relationship between Christopher and his father, as evidenced by her refusal to allow Christopher to attend Knapp family events, her withholding visitation, her continued demeaning and belittling actions towards Mr. Knapp both in Christopher’s presence and through digital communication, and her having involved the police with Mr. Knapp on several occasions despite her knowledge that doing so could negatively impact Christopher. Conversely, Mr. Knapp testified regarding his attempts to encourage Christopher to love his mother. Having found Ms. Bushman to be unwilling to facilitate an ongoing relationship between father and son, the court determined this factor weighed in favor of Mr. Knapp.
(11) The distance between the respective residences of the parties.
Ms. Bushman lives in New Orleans and Mr. Knapp lives in Mandeville, a distance of approximately 35 miles. Finding the distance has not caused significant issues with custody exchanges, the trial court determined this factor was neutral.
|r4 (12) The responsibility for the care and rearing of the child previously exercised by each party.
The trial court noted that Ms. Bushman has been responsible for the majority of Christopher’s care for his entire life and, although Mr. Knapp was largely uninvolved in the rearing of Christopher during his early years, since moving back to Louisiana, he has taken an active role in parenting and fostered a positive and loving relationship with his son. Because Ms. Bushman has been Christopher’s primary caregiver, the court determined this factor to weigh “slightly in her favor.”
Based upon its extensive and detailed consideration of the above Article 134 factors, the trial court concluded that “it is in the best interest of the minor child to reside primarily with his father.” In summary, according to the trial court’s written reasons, the primary factors it relied upon to substantiate a change in domiciliary status include: (1) Ms. Bushman’s continued demeaning of Mr. Knapp in violation of the co-parenting guidelines; (2) Ms. Bushman’s continued allowing of the child to sleep in her bed; (3) Ms. Bushman’s “little concern” over the child’s absences from school the past school year; (4) Ms. Bushman’s unemployed status; (5) Ms. Bushman’s refusal to foster a relationship with the child’s father; (6) Mr. Knapp’s demonstrated ability to provide a stable environment for the child and his willingness to ensure a close relationship between the child and Ms. Bushman.
On appeal, the gravamen of Ms. Bushman’s argument is that the trial court’s ruling is not supported by the record evidence. Specifically, Ms. Bushman contends that in making its domiciliary determination, the trial court failed to assign appropriate weight to certain testimony when evaluating the Article 134 factors, failed to consider “other relevant factors,” and failed to adequately | asconsider the testimony and report of Dr. Klein, the court-appointed custody evaluator, who opined that Ms. Bushman should remain the domiciliary parent. According to Ms. Bushman, the trial court’s determination is clearly wrong, and to allow the change in domiciliary status to stand “would cause the child emotional harm.” We disagree. Although we are not convinced that if we, ourselves, were to decide the issue de novo, we would have reached the same result as the trial court, that is not the standard here. Based upon our review of the conflicting testimony and record evi *152 dence, we find no abuse of discretion, as the trial court made every effort to assess the best interests of Christopher in light of all of the evidence presented.
A. Article 134 and “Other Relevant” Factors
As summarized above, after considering the testimony of the witnesses and the evidence presented, the trial court found that factors 1 and 12 favored Ms. Bushman, factors 7 and 11 were neutral, and that factors 2-6, 8 and 10 favored Mr. Knapp. Because of the age of the child, the trial court did not consider factor 9. As noted in the comments to Article 134 of the Louisiana Civil Code, “the factors are simply provided as a guide to the court in making the fundamental finding as to what disposition is in the best interest of the child.” La. C.C. art. 134, comment (a). The comments also make clear that “the list of factors provided in this Article is nonexclusive, and the determination as to the weight to be given each factor is left to the discretion of the trial court.” La. C.C. art. 134, comment (b).
Finding the evidence relative to the factors enumerated in Article 134 weighed largely in favor of Mr. Knapp, the trial court determined a change in domiciliary status was warranted. Ms, Bushman avers the trial court abused its discretion when evaluating the factors by failing to assign the proper weight to ^¡portions of the record testimony and further, by failing to properly consider “other relevant factors.” Specifically, Ms. Bushman avers the trial court failed to give the necessary weight to her trial testimony concerning the following:
• Mr. Knapp’s complete lack of involvement in Christopher’s school, Audubon Montessori, and extracurricular activities (ie,, he failed to attend parent-teacher conferences, PTO meetings, and was unaware of the child’s subjects or the school’s grading system), versus her active involvement in the school—one of the top charter schools in New Orleans—and her ongoing relationship with the faculty, administration, and PTO organization (ie., she was recognized as one of school’s top five parent volunteers and elected as the Communication Chair of the PTO), and the fact that Christopher loves his school, was receiving good grades and has a core group of friends there;
• All of Christopher’s absences from school were explained and most of them were excused;
• The reason she quit her $69,000 job was in order that she could spend more time with Christopher and so that she could enroll in management courses to complete her Associate’s degree for purposes of increasing her employment marketability, and the fact that she is living off of her 401k savings and some of the proceeds from the settlement of her Son’s personal injury lawsuit while looking for alternate employment does not mean that she is financially less stable for parenting purposes;
• Mr. Knapp was not present for the first several years of Christopher’s life, and at the time of trial had only spent one weekend a month with Christopher since his return to Louisiana in November 2013;
• While Mr. Knapp has more relatives than she does, she has a “family-like support system of friends” living closely around her and is becoming close to many of the parents at Christopher’s school;
• Mr. Knapp fails to spend the night with his son one night of the two *153 nights each weekend he has visitation |a7and, instead, allows Christopher to sleep .at his grandmother’s home;
• Mr. Knapp has had “numerous live-in girlfriends” over the past several years, and recently broke up with a long-term girlfriend, and the fact that this “revolving door of intimate partners does not bode well for the young child;”
• The potential negative impact upon Christopher and the inappropriateness of him being exposed to Mr. Knapp’s practice of cutting skin off his back in Native American ceremonies;
• Christopher has separation anxiety when away from her and while she is trying to transition Christopher to sleeping in his own bed through sleep-overs, he is scared of many things and sleeping with her is a ■ comfort to him; and,
• Mr. Knapp exhibits passive-aggressive behaviors towards her and is also responsible for the contentious relationship existing between them.
As to each of the items listed above, there was conflicting testimony. Mr. Knapp testified that while he did not attend every parent-teacher conference at Audubon Montessori, he was in contact with Christopher’s teachers and did participate in some of Christopher’s extracurricular activities, such as soccer. Mr. Knapp’s mother also attended Grandparents’ Day.
Mr. Knapp testified that, regarding Christopher’s absences from school, one entire week was allegedly due to his being upset over the death of a child that he did not personally know. Several other days had nothing to do with Christopher, but rather, resulted from Ms. Bushman having terrible menstrual cramps. He claims Ms. Bushman could have, but chose not to, call him or one of his family members to assist her to ensure Christopher’s attendance at school.
lasFurther, at the time of trial, Ms. Bushman had been voluntarily unemployed for eight months and had approximately only $12,000 with which to support herself and Christopher in the future. Though Ms. Bushman testified that she was seeking alternate employment, she- presented no testimony to. substantiate this assertion.
Mr. Knapp admitted that he had not been a part of Christopher’s life during the child’s first year, but explained that his paternity had not yet been established and he had ample reason to believe that he might not be Christopher’s father. Mr. Knapp testified that once his paternity was confirmed, he began regular monthly visitation with Christopher, traveling from North Carolina to Louisiana, and continued this practice until his return to Mandeville in November 2013. If he was unable to make the trip on a particular month, his mother or brother would exercise visitation with Christopher in his stead. He testified that currently, on most of the weekends he exercises visitation with Christopher, the child does spend at least one night with his grandmother, who lives on the same block as Mr. Knapp. The child clearly loves his grandmother and wants to be with her. Mr. Knapp’s testimony was corroborated at trial through the testimony of his mother, Mary Grace, and brother, Kyle. Further, Ms. Bushman admitted at trial that she does not have a problem with Christopher sleeping at his grandmother’s house or spending time with his uncles.
Though Ms. Bushman testified to having a “family-like support system of friends” living closely around her, she did not provide the name of a single | aafriend.[21] More *154 over, she called no one to testify at trial on her behalf to substantiate her testimony in this regard.
As to Mr. Knapp having a “revolving door” of live-in girlfriends over the past several years, other than Ms. Bushman’s testimony, there is nothing in the record to corroborate this allegation. The only evidence presented was a long-term relationship with one live-in girlfriend, which existed at the time of Dr. Klein’s evaluation, but had ended by the time of trial.
Additionally, the testimony in the record does not support Ms. Bushman’s assertion that Christopher has been “exposed” to Mr. Knapp’s practice of skin-cutting. While Mr. Knapp confirmed that he engages in this practice as a means of releasing anger, he stated that Christopher has not seen him actually participate in the ritual. Rather, Christopher merely saw the cuts on his father’s back on one occasion when Mr. Knapp was shirtless while in his own home. Mr. Knapp testified that he then explained the ritual to Christopher. Though Dr. Klein testified that this practice might be difficult for a child Christopher’s age to understand, recognizing this practice to be part of a protected religious practice, he declined to testify regarding any potential negative impact it might have upon the child.
Regarding Ms. Bushman’s testimony that she has been actively trying to transition Christopher out of her bed at night, she admitted that, at the time of trial, he had only slept by himself in her home on five occasions in his life. Moreover, Dr. Klein testified that, in his opinion after observing and interviewing | ^Christopher, continuing to sleep with his mother was not in the child’s best interest and could lead to insecurity and a lack of self-confidence. Completely disregarding Dr. Klein’s admonition to the contrary, Ms. Bushman explained that she allowed Christopher to continue to sleep with her because of his many fears and because she did not think this pattern or “custom” was harmful to him.
Lastly, the testimony from all of the witnesses confirmed that both Mr. Knapp and Ms. Bushman have treated one another with acrimony over the years. The overwhelming testimony, however, also confirmed that Ms. Bushman’s continued use of profanity and demeaning language towards Mr. Knapp and his family is more pronounced and often occurs in Christopher’s presence.
Our review of the record convinces us that, not only has Ms. Bushman demonstrated an unwillingness to facilitate a relationship between Christopher and his father, she has repeatedly thwarted the efforts of both Mr. Knapp and his family to see Christopher and spend significant time with him. The trial court correctly recognized that it is in Christopher’s best interest to have both his mother and his father in his life, and we cannot say that the court was clearly wrong in determining that Christopher’s chance of having a relationship with both parents at this juncture is more likely with his father as domiciliary parent. We also note that the previous admonishments to Ms. Bushman by both the trial court and Dr. Klein to abide by the co-parenting guidelines, to cease using profane language and to stop belittling Mr. Knapp, both in front of Christopher and in their digital communications, have been largely ignored by her. Moreover, her continuing to sleep with Christopher to his potential detriment and her lack of support regarding the *155 child’s school attendance are supported by the record.
14-, After reviewing the record in its entirety, while we may have weighed portions of the testimony and evidence differently, we cannot say the trial court, as the trier of fact, failed to consider Ms. Bushman’s testimony or improperly weighed the evidence presented. When faced with the conflicting evidence, the trial court made credibility determinations that were not in Ms. Bushman’s favor. Accordingly, we do not find the trial court abused its discretion or was clearly wrong in concluding that it was in Christopher’s best interest to change domiciliary status from Ms. Bushman to Mr. Knapp.
B. Dr. Klein’s Expert Opinion[22]
Ms. Bushman argues the trial court erred in failing to assign the proper weight to Dr. Klein’s testimony, who stated that, in his expert opinion, it was in the best interest of Christopher for Ms. Bushman to remain as the domiciliary parent. According to Dr. Klein, because of the close bond existing between mother and son, to disrupt this attachment by changing custodial arrangements could potentially generate emotional harm to Christopher.
While it is true that at trial Dr. Klein recommended a continuation of joint custody and that Ms. Bushman remain Christopher’s domiciliary parent, by the time this matter came to trial, it had been well over a year since Dr. Klein had met with either of the parties or with Christopher. Moreover, it was apparent that Dr. |42Klein had not reviewed his year-old expert report prior to his testifying at trial.[23] Consequently, Dr. Klein was admittedly unaware of several current salient facts, including the following: Ms. Bushman had been voluntarily unemployed for nearly eight months; despite his prior professional advice to Ms. Bushman, Christopher was continuing to sleep in her bed; and, Christopher had accrued a substantial number of absences from school. Additionally, when questioned about his knowledge regarding other material matters, it became apparent that Ms. Bushman had not provided Dr. Klein with either a complete psychological history, financial history, or an accurate arrest history.[24] Upon being *156 asked whether any of this new information would alter his opinion, Dr. Klein stated that he would “not [make] any new recommendations in this case.” Further, when repeatedly questioned regarding the basis for his unwavering opinion that Ms. Bushman should remain the domiciliary parent, he conceded that his recommendation was focused primarily upon the fact that Ms. Bushman had consistently been the domiciliary parent for the whole of Christopher’s life and the strong mother-son bond existing between them.
Expert testimony is to be weighed by the trial court the same as any other evidence. Moreau v. Moreau, 15-0564, p. 7 (La. App. 4 Cir. 11/18/15), 179 So.3d U819, 824. “[A]fter weighing and evaluating expert and lay testimony, the trial court may accept or reject the opinion expressed by any expert.” Orrill v. Orrill, 08-0400, p, 6 (La. App. 4 Cir. 2/4/09), 5 So.3d 279, 283 (quoting Warlick v. Warwick, 27,389 (La. App. 2 Cir. 9/29/95), 661 So.2d 706, 710). The effect and weight to be given to expert testimony is within the broad discretion of the trial judge. Moreau, 15-0564 at p. 7, 179 So.3d at 824. It is well settled that the trial court is not bound by expert testimony. Fernandez v. Pizzalato, 04-1676, pp. 20-21 (La. App. 4 Cir. 4/27/05), 902 So.2d 1112, 1125 (citing Enlow v. Enlow, 479 So.2d 650, 653 (La. App. 1st Cir. 1985)). Moreover, this court has held that “[declining to adopt a court-appointed expert’s custody recommendation is not error.” Orrill, supra (citing Monteleone v. Monteleone, 591 So.2d 1228, 1236 (La. App. 4th Cir. 1991)).
Based upon our review of the record and the trial court’s written reasons for judgment, contrary to Ms. Bushman’s assertions on appeal, we cannot say that the trial court did not fully consider and properly weigh Dr. Klein’s expert testimony and recommendation in making its decision to change the domiciliary designation in this case. The trial court, exercising its broad discretion to accept or reject Dr. Klein’s opinion in whole or in part, obviously chose to reject it. Accordingly, we find the trial court did not abuse its discretion.
CONCLUSION
For the foregoing reasons, we affirm the trial court’s judgment. The record on appeal supports the trial court’s granting of Mr. Knapp’s rules for contempt against Ms. Bushman for her failure to allow summer vacation and ordering her to pay the associated court costs and attorney’s fees, and for her diminishment of the child’s love and affection for him. The record further supports the trial court’s [^denial of Ms. Bushman’s rules for contempt against Mr. Knapp for failing to notify her when the child does not spend the night at his home during his visitation and for failing to reimburse her for Christopher’s uncovered medical expenses.
Insofar as addressing the change in domiciliary status, the trial court was faced with an untenable situation, as the toxicity existing between Ms. Bushman and Mr. Knapp appears to have escalated rather than abated over the years. The trial court obviously believed that if a significant and immediate change in the child’s environment did not occur, the future welfare of Christopher in regard to his mental and emotional adjustment would be at risk. At the time of trial, the plan in place was clearly not working, and apparently had not been working for some time. In our view, the trial court’s decision to change the domiciliary parent was not meant to be a punishment of Ms. Bushman or a reward to Mr. Knapp, as Ms. Bushman seeks to characterize it, but rather a means to facilitate the significant change that needed to occur so that going forward, both parties, *157 who obviously love their son, can re-focus and begin to concern themselves solely with the best interests of Christopher.
AFFIRMED.

. Neither party tested positive for illicit drugs.

. Mr. Knapp was solely responsible for the transportation costs associated with exercising his physical custody of Christopher in Louisiana.

. For example, Mr. Knapp sought to have Ms. Bushman held in contempt for allegedly refusing to allow him to attend Christopher’s first birthday, interfering with court-ordered visitation, and engaging in harassing behavior against him, some of which he claimed occurred in the presence of the child. Ms. Bushman sought to have Mr. Knapp held in contempt for purportedly failing to pay child support and to provide insurance for Christopher.

. The Consent Judgment ordered the parties to comply with the following co-parenting guidelines:
a. [The parents are] [t]o share information with each other about the child in a timely manner so as to coordinate and facilitate their parenting together. This information may include, but is not limited to medical, educational, social, psychological, and religious aspects of the child's life.
b. All material, child sharing, court related and financial communications between the parents shall occur at a time when the child is not or within hearing range. Communication regarding these issues shall not occur at times of exchanges of the child or during telephone visits with the child.
c. Neither parent shall say nor do anything in the presence or hearing of the child that would in any way diminish the child’s love or affection for the other parent, and shall not allow others to do so.
d. Each parent shall always keep the other informed of his/her actual address of residence, mailing if different, home and work telephone numbers and any changes within twenty-four hours of such change occurring.
e. Each parent shall inform the other as soon as possible of all school, sporting and other special activity notices and cooperate in the child’s consistent attendance at such events. Neither parent shall schedule activities during the other parent’s scheduled parenting time without notice to the other parent; and
f. Neither parent shall move the residence of the child out of state or within the state at a distance of more than 150 miles from the other parent without giving the other party written notice as required by La. R.S. 9:355.1 et seq.

. The parties further agreed that: Mr, Knapp would have access to Christopher's school and psychological records and would allow for daily telephone contact with Christopher for the parent not having physical custody. Also included in the Consent Judgment was an order requiring the parties to first attempt resolution of any issues existing between them with the court appointed parenting coordinator prior to filing pleadings with the court.

. Also during this timeframe, Ms. Bushman petitioned the court to be named Christopher's natural tutrix for purposes of allowing her to represent his interests in a personal injury suit, which request was granted by the court.

. This portion regarding reimbursement of medical expenses is discussed in greater detail infra as it forms the basis of one of the issues before us on appeal concerning Ms, Bushman's rule for contempt against Mr. Knapp for his failure to reimburse her for his pro rata share of Christopher's medical expenses.

. Our Family Wizard is a web-based tool designed to assist divorced and never-married parents to communicate regarding custody schedules, parenting plans and other child custody arrangements.

. Mr. Knapp returned from North Carolina to live in Mandeville, Louisiana in November of 2013, the same month Christopher turned four years old.

. Mr. Knapp was ordered to pay any late fees associated with child care in the event he picked the child up later than 5:30 on Friday afternoons.

. Without finding her to be in contempt, the judgment ordered Ms. Bushman to reimburse Mr. Knapp $1,500 within 90 days of the judgment representing her potion of Dr. Klein’s fees.

. Further, all provisions of prior judgments not in conflict with the July 15, 2016 judgment were ordered to remain in full force and effect.

. In her brief, Ms. Bushman cites to several pages of her trial testimony, which she contends provide examples of Mr. Knapp’s “belittling conduct [towards her] in front of the child,” but a review of that testimony does not support her contention that Mr. Knapp was in violation of the co-parenting guidelines. 14. At trial, Ms. Bushman denied she ever said this and claims Christopher later admitted to lying and was merely saying what he thought his father and his father’s family wanted to hear.

. Both parties testified that the exchanges of the child following Mr. Knapp’s exercise of visitation are the most difficult,

. Ms. Bushman did proffer the Our Family Wizard emails that she purportedly sent to Mr. Knapp from 2013 to 2015, but no statements, receipts or cancelled checks evidencing the expenses incurred were made a part of the record. Consequently, it is impossible to discern from the record on appeal the name of the medical provider, the actual expense incurred, or Mr. Knapp’s alleged pro rata share owed.

. We note that, in its written reasons, the trial court was in error when it stated that, pursuant to the judgment, Ms. Bushman is responsible for notifying Mr. Knapp within thirty days of incurring an uncovered expense by "sending him proof of payment.” According to the express language of the judgment, Ms. Bushman is only required to provide Mr, Knapp with a copy of the expense incurred— in the form of either a statement, receipt or cancelled check—in writing within thirty days of incurring the expense in order to preserve her right to reimbursement. Thus, Ms. Bushman’s right to reimbursement from Mr. Knapp of his proportionate share of a non-covered expense incurred is not contingent upon proof of her having actually paid the *147 expense, but rather, Mr. Knapp’s obligation to pay his proportionate share of a non-covered expense incurred arises after Ms. Bushman has paid the first $250 of the calendar year and has provided him with written proof within thirty days of the expense having been incurred. Thus, while we find the record does not support holding Mr. Knapp in contempt for his failure to reimburse Ms. Bushman, we recognize that medical expenses on behalf of Christopher have apparently been incurred and that, upon a proper showing, Mr. Knapp owes reimbursement to Ms. Bushman for his pro rata share of those expenses.

. The trial court acknowledged that since Mr. Knapp’s return to Louisiana, his recent involvement in Christopher's life has im *149 proved the emotional ties between father and son.

. At trial, Mr. Knapp testified that he participates in Native American ritualistic back cutting and that Christopher is aware of this practice. Christopher has accompanied Mr. Knapp to Native American Sun Dance ceremonies.

. Because both parties' physical homes were long-term residences, the trial court did not consider the difference between Ms. Bushman’s renting of hers and Mr. Knapp’s owning of his home to be significant.

. Ms. Bushman did testify regarding a friend named Sandy, who used to help her financial *154 ly each month during the first years of Christopher’s life. It is unclear from the record whether Sandy is still in Ms. Bushman’s circle of friends.

.In the January 8, 2015 consent judgment, Dr. Klein was appointed to conduct a custody evaluation. Mr. Knapp first met with Dr. Klein less than one week later on January 13, 2015, and underwent a psychological evaluation on January 27, 2015. Due to her inability to pay her one-half of the costs of the evaluation, Ms. Bushman was not initially seen by Dr. Klein until March 19, 2015 and, thereafter, underwent psychological testing on March 26, 2015. To complete the evaluation process, Dr. Klein met with Mr. Knapp on three more occasions (twice, individually, and once with Christopher), and with Ms. Bushman twice more (once, individually, and once with Christopher). Dr. Klein completed the interview process with the parties on June 2, 2015, having last interviewed Ms. Bushman and Christopher on April 14, 2015, and issued his written report on August 15, 2015. Dr. Klein was not called to testify at trial until June 2016, over a year from having last interviewed either of the parties.

. The trial court refused to allow Dr. Klein’s report into evidence because the information obtained and upon which the report was based was over a year old.

. The record evidence indicates, and the trial court found, that Ms. Bushman had previously been diagnosed with anxiety and depression and was taking medication to treat those disorders. The evidence also suggested that she struggles with obsessive, compulsive issues that were possibly understated in her interviews with Dr. Klein. And while Dr. Klein testified that Ms. Bushman's involvement in psychotherapy to deal with her issues was arguably a positive sign, he admittedly did not explore the nature or reasons for her psychotherapy. Lastly, Ms. Bushman did not tell Dr. Klein that she had filed for bankruptcy, nor did she tell him of a prior arrest for serving alcohol to a minor.