| | | |
|---|---|---|
| **CARMELITE NARCISSE-THOMAS** | * | **NO. 2023-CA-0463** |
| | * | |
| **VERSUS** | * | **COURT OF APPEAL** |
| | * | |
| **MARC DAVID THOMAS** | * | **FOURTH CIRCUIT** |
| | * | |
| | | **STATE OF LOUISIANA** |

\* \* \* \* \* \* \*

CONSOLIDATED WITH:                    CONSOLIDATED WITH:

MARC DAVID THOMAS                    NO. 2023-CA-0464

VERSUS

CARMELITE NARCISSE-THOMAS

APPEAL FROM
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2020-01418, DIVISION "H"
Honorable Monique E. Barial, Judge
\* \* \* \* \* \*
**Judge Dale N. Atkins**
\* \* \* \* \* \*

(Court composed of Judge Sandra Cabrina Jenkins, Judge Dale N. Atkins, Judge Rachael D. Johnson)


Theon A. Wilson
1100 Poydras Street, Suite 1160
New Orleans, LA 70163


            COUNSEL FOR PLAINTIFF/APPELLANT, Carmelite Narcisse-Thomas

Cindy H. Williams
111 Veterans Memorial Blvd., Suite 200
Metairie, LA 70005


            COUNSEL FOR DEFENDANT/APPELLEE, Marc David Thomas

                                        **AFFIRMED; REMANDED**
                                        **MAY 3, 2024**

DNA

SCJ

RDJ

This is a relocation dispute under La. R.S. 9:355.1-9:355.17. Appellant, Carmelite Narcisse-Thomas ("Ms. Narcisse"),[1] appeals the trial court's January 19, 2023 judgment ("Relocation Judgment"), which denied her "Motion to Obtain Court Approval to Relocate" ("Motion to Relocate") wherein she sought to relocate from New Orleans, Louisiana, to Jacksonville, Florida, with her two minor daughters with whom she shares joint custody with her ex-husband, Appellee, Marc David Thomas ("Mr. Thomas"). Additionally, Ms. Narcisse appeals the trial court's April 6, 2023 judgment ("Contempt Judgment"), which granted a Motion for Contempt filed by Mr. Thomas against Ms. Narcisse and ordered Ms. Narcisse to reimburse Mr. Thomas for the filing fee associated with his Motion for Contempt. For the following reasons, we affirm the Relocation and Contempt Judgments, and we remand this matter for further proceedings consistent with this Opinion.

---

[1] This Opinion will refer to Carmelite Narcisse-Thomas as "Ms. Narcisse" because that is how she refers to herself in her brief to this Court.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

Ms. Narcisse and Mr. Thomas were previously married, and they are the parents of two minor daughters, Ma.T. and Mo.T.[2] After Ms. Narcisse and Mr. Thomas separated, an August 20, 2020 consent judgment ("Consent Judgment") established a physical custody schedule and provided that Mr. Thomas would have physical custody of the children on alternating weekends on Saturday from 10:00 a.m. until 6:00 p.m. and on Sunday from 10:00 a.m. until 6:00 p.m. Then, a January 29, 2021 consent judgment awarded the parties joint custody; designated Ms. Narcisse as the domiciliary parent; and maintained the physical custody schedule originally established in the Consent Judgment. On December 16, 2021, the trial court signed a judgment of divorce, thereby dissolving the marriage between Ms. Narcisse and Mr. Thomas.

### Motion to Relocate

On October 19, 2022, Ms. Narcisse filed her Motion to Relocate, explaining therein that she first informed Mr. Thomas in January 2022 of her desire to move out of New Orleans. Ms. Narcisse stated that after so informing Mr. Thomas, she subsequently obtained employment in Jacksonville and again notified him in September 2022 that she wished to relocate. In the Motion to Relocate, Ms. Narcisse explained that Mr. Thomas responded in September 2022 with his

---

[2] This Opinion will use the initials of the minor children to protect their identity. *See* Uniform Rules, Louisiana Courts of Appeal, Rules 5-1 and 5-2. *See also Barak v. Saacks*, 2021-0756, 0757, 0758, 0759, p. 2 (La. App. 4 Cir. 10/12/22), 367 So.3d 656, 658 n.3 (first citing Uniform Rules, Louisiana Courts of Appeal, Rules 5-1 and 5-2; and then citing *Council v. Livingston*, 2019-1049, p. 1 (La. App. 4 Cir. 3/13/20), 364 So.3d 410, 412 n.1.), *writ denied*, 2022-01734, p. 1 (La. 1/11/23), 352 So.3d 987. Because both of the parties' daughters have the same initials, however, we will use the second letter of each daughter's name to be able to distinguish them when necessary.

2

objection to the relocation. Ms. Narcisse further explained that her new job in Jacksonville was scheduled to begin on November 7, 2022.

Ms. Narcisse also explained in her Motion to Relocate the reasons why she believed that relocation to Jacksonville was in the best interest of the children. Specifically, Ms. Narcisse stated that her new job in Jacksonville would pay her fifty percent more than her current salary; that each of the children would have their own bedroom in the house she planned to move into in Jacksonville; and that the children were "super excited to move to Florida." Ms. Narcisse contended that Mr. Thomas was in arrears in his child support payments and had not made payments on the arrears in over one year. She further contended that Mr. Thomas "regularly does not exercise his court[-]ordered physical custody of the children" because "[h]e regularly [says] . . . that he has to work on his scheduled weekends" but rejects her offers to switch weekends. Ms. Narcisse also asserted that Mr. Thomas told Ma.T. that Mo.T. was "his favorite." Finally, Ms. Narcisse stated that the company for whom Mr. Thomas was working at the time (Cintas) had locations in Florida, thereby implying that Mr. Thomas could move there too.

Originally, the trial court set an expedited hearing date of November 7, 2022, to determine whether to permit Ms. Narcisse to temporarily relocate pending a final decision on the issue of relocation. However, initial attempts to serve Mr. Thomas were unsuccessful, and Mr. Thomas did not appear at the November 7, 2022 hearing. The trial court set the relocation hearing for mid-December 2022 and determined that the November 7, 2022 hearing was moot as a result of the future hearing date.

<u>**Hearing on Motion to Relocate**</u>

On December 15, 2022, the trial court held a hearing on Ms. Narcisse's Motion to Relocate, at which both Ms. Narcisse and Mr. Thomas testified.

*Ms. Narcisse's Testimony*

Ms. Narcisse testified that, at the time of the hearing, she was already living in Jacksonville with Ma.T. and Mo.T., as well as her son, C.B.[3] Ms. Narcisse explained that between the date of the originally scheduled hearing, November 7, 2022, and the present, she moved to Jacksonville because she had already given notice to her job in New Orleans and thus no longer had a job there whereas her job in Jacksonville had started. Ms. Narcisse also stated that, prior to the move, she "was kind of in limbo to get clarification on what to do from [Mr. Thomas]" because Mr. Thomas had previously informed her that he would be attending trucking school for twelve weeks and would let her know when to resume his custody weekends. Ms. Narcisse stated that, with her start date in Jacksonville approaching, she "made the executive decision and . . . left [for Jacksonville]."

When asked why she first began considering relocating, Ms. Narcisse responded, "I wanted to get out [of New Orleans], get my kids into a better environment." Ms. Narcisse elaborated on her response when asked what was wrong with her environment in New Orleans, stating "[e]verything. The city, the school system, the pay grade, the crime." Regarding the crime near her former home in New Orleans, Ms. Narcisse testified that they could hear gunshots from inside their house and that she did not want to raise her children in that environment. In contrast, Ms. Narcisse stated that she had not heard gunshots since moving to Jacksonville. Discussing the house in New Orleans versus the one in

---

[3] Mr. Thomas is not the father of C.B.

Jacksonville, Ms. Narcisse testified that their house in New Orleans had three bedrooms, two bathrooms, and approximately 1200 square feet. Ms. Narcisse stated that the girls could not play outside their house in New Orleans because she was nervous, citing the narrowness of the street and crime concerns. Ms. Narcisse described the house in Jacksonville as having four bedrooms, two bathrooms, a den, and approximately 2436 square feet. Regarding the Jacksonville house, Ms. Narcisse stated, "The girls are finally separate. They get their own room," and "[t]hey love it." Ms. Narcisse also stated that the girls could play outside in Jacksonville, noting a park five houses away from their home and contending that the girls "love" the neighborhood.

Turning to the topic of her job in New Orleans versus her job in Jacksonville, Ms. Narcisse testified that in New Orleans she worked as a revenue cycle supervisor at Ochsner at a salary rate of $48,000 per year. By contrast, Ms. Narcisse explained that at her new job in Jacksonville she worked as a revenue cycle supervisor of finance (patient financial services) at a salary rate of $77,000 per year plus she received a $5,000 relocation fee and a $2,000 stipend to travel there to apply and test. Ms. Narcisse also stated that her salary would increase to $90,000 per year in January 2023. In addition to having looked for a job in Jacksonville, Ms. Narcisse explained that she also looked for a new job in Houston, Texas, and in Wisconsin. When asked how the cost of living in Jacksonville compared to New Orleans, Ms. Narcisse responded, "[it is] not that much . . . higher." She contended that her higher salary in Jacksonville positively affected her daughters because she could "do way . . . more as far as planning trips" and she had "more money in the bank to work on [her] credit," though she clarified that she was "not the buying type of mom" and did not just buy things for

her children with her extra money. In discussing her Jacksonville job, Ms. Narcisse reflected, however, that the only thing that her Jacksonville job "[took] away" was her ability to work remotely (from home).

Discussing her daughters' education in New Orleans, Ms. Narcisse stated, "I wanted them to get a better education. And getting them into better schools was not an easy thing. So, to get them into better schools, I wanted to be able to do that much easier." Ms. Narcisse stated that in New Orleans, the approximately one-hour commute from their home to the girls' school, Bricolage Academy, made her "late for work most of the time." By contrast, Ms. Narcisse testified that Ma.T. could walk to her school with other kids from their subdivision in Jacksonville. When asked about Ma.T.'s Jacksonville school, Ms. Narcisse responded, "I love it and [she] loves it," noting that the principal knows the students' names and Ma.T. had already made friends at the school. In this latter regard, Ms. Narcisse contended that Ma.T. stated after her first day of school in Jacksonville that "these kids [in Jacksonville] are not like New Orleans kids. [They are] different. [They are] nice." Education-wise, Ms. Narcisse explained that she liked the Jacksonville school better because the teachers were in contact with her daily and Ma.T. was "challenged and . . . her grades [we]re not just given to her." Ms. Narcisse further stated that Ma.T.'s Jacksonville school hosted nights for parents on various topics, such as crime and safety, and that the school's addition of a middle school program would allow Ma.T. to remain there in the future. Ms. Narcisse also stated that she was looking into a magnet program for Ma.T. for middle school. Ms. Narcisse mostly discussed Ma.T.'s school but stated that Mo.T. attended a daycare program in Jacksonville.

Turning to her daughters' extracurricular activities, Ms. Narcisse testified that both girls took gymnastics lessons in New Orleans and Ma.T. was a cheerleader at school. In terms of extracurricular activities in Jacksonville, Ms. Narcisse stated that her daughters went "to Five Below once a week" and that Ma.T. joined the cheerleading team at school. She explained that she planned to enroll both of her daughters in a gymnastics program in Jacksonville but had not done so yet.

Ms. Narcisse also testified about Mr. Thomas. She stated that he was not current on his court-ordered child support and had never paid any money toward his child support arrears. Ms. Narcisse reiterated her contention that Mr. Thomas told Ma.T. that Mo.T. was his "favorite." Ms. Narcisse testified that Mr. Thomas showed favoritism toward Mo.T. by "giving her more" and by ignoring Ma.T., and she stated that this had been an ongoing issue. Further, Ms. Narcisse alleged that Mr. Thomas did not always exercise his custodial visits with their daughters, estimating that Mr. Thomas missed three visits in the previous one-year period. Ms. Narcisse stated that, in those instances, she offered to switch to a weekend more convenient for Mr. Thomas, but he did not accept the offer. Ms. Narcisse explained that when she did bring Ma.T. and Mo.T. to see Mr. Thomas, she would bring them to Mr. Thomas' grandmother's house for him to exercise his physical custody. Regarding Mr. Thomas, Ms. Narcisse also testified that she had filed a Petition for Protection from Abuse against him, and that she received an injunction in response.

Additionally, Ms. Narcisse testified that Mr. Thomas had not called their daughters since they moved to Jacksonville; and Ms. Narcisse contended that their daughters had not asked to speak to Mr. Thomas since the move. She also stated,

however, that she had not encouraged their daughters to call Mr. Thomas. Ms. Narcisse conceded that prior to their move to Jacksonville, there were times when Mr. Thomas called during his court-appointed time that she informed Mr. Thomas that the girls could not speak to him because it was their gymnastics time.

Overall, Ms. Narcisse testified that "[t]he girls love Jacksonville, everything about it." When asked to cite additional reasons for her statement (on top of her earlier contentions about making friends at school and having a park in their neighborhood), Ms. Narcisse stated that her daughters "[cannot] wait to get to the beach when it opens up. [Mo.T.] asks every weekend." Ms. Narcisse further stated, "[Mo.T.] [cannot] wait for Fun Friday. [That is] what we call our Fridays, Fun Friday. We do something every weekend."

In terms of a support system for her daughters in Jacksonville, Ms. Narcisse listed her fiancé and stated that he lives with them in Jacksonville. She contended that her fiancé's relationship with her daughters "is really amazing." Ms. Narcisse answered affirmatively when asked whether her fiancé was willing to help her whenever she needed something for her daughters, stating, "I [do not] have to ask. He brings them to school every day."[4]

When asked what schedule she thought would be best for Mr. Thomas and their daughters in the event the trial court granted her Motion to Relocate, Ms. Narcisse suggested that he could see their daughters one weekend per month and that she and Mr. Thomas could split the summertime. Ms. Narcisse stated that she

_____

[4] It is unclear from the record how this explanation about her fiancé dropping Ma.T. and Mo.T. off at school fits into Ms. Narcisse's earlier explanation that Ma.T. walks to her school in Jacksonville with other children from their neighborhood.

also offered to meet Mr. Thomas halfway to exchange their daughters for his weekends.

### *Mr. Thomas' Testimony*

Mr. Thomas also testified at the hearing and voiced his objection to Ms. Narcisse moving to Jacksonville with their daughters. Mr. Thomas testified that he and Ms. Narcisse never had a conversation in which he told her that it was okay to move with their daughters. He stated, "I [do not] feel as though any amount of money is worth my daughters not being in my life." Discussing his viewpoint on New Orleans versus Jacksonville, Mr. Thomas stated, "New Orleans is bad. Jacksonville is bad. [It is] bad everywhere." The trial court asked Mr. Thomas whether he would look into moving to Florida to be closer to his children if the trial court granted Ms. Narcisse's Motion to Relocate, and he responded that he would not. Mr. Thomas stated that he had not looked for jobs in Florida.

Mr. Thomas also contended that Ms. Narcisse had not abided by the court-ordered phone call schedule and did not make up for it at a different time if the girls were busy when he called. Mr. Thomas explained that he asked why he could not speak to the girls at other times if they were participating in extracurricular activities during the court-ordered time. He alleged that Ms. Narcisse did not allow the girls to call him and if he called "[it was] up to her if she wants to let me talk to them." Countering Ms. Narcisse's assertion that he had not tried to contact their daughters since the move to Jacksonville, Mr. Thomas testified that he attempted to contact them via phone call and text message on one occasion from his grandmother's phone. During Mr. Thomas' testimony, counsel for Ms. Narcisse asked Mr. Thomas if he was aware that Ma.T. and Mo.T. spoke regularly to his grandmother, and he responded that he was not aware of that.

9

Regarding Ms. Narcisse's allegation that Mr. Thomas favored Mo.T. over Ma.T, Mr. Thomas explained, "I call [Ma.T.] my first love and I call [Mo.T.] my favorite. [That is] how I define it. [It is] something that we have between us and [she is] taking it and twisting it however she wants to twist it." He followed up, "Both of my girls know I love them and they love being with me." Regarding Ms. Narcisse's contentions about his failure to pay child support arrears, Mr. Thomas countered that he had been making payments toward his arrears and that money had been taken out of his paycheck to go toward his arrears. During Mr. Thomas' testimony, the trial court noted that the amount Mr. Thomas owed in arrears depended on whether a payment had been made by Mr. Thomas as he alleged. When asked whether he was currently working, Mr. Thomas replied, "Yes, I am working, but [I am] out right now with my shoulder." He further stated that he was not currently earning a paycheck.

At the close of testimony, the trial court informed the parties that the court would take the matter under advisement. The trial court judge specified that the court "need[ed] to deliberate on this personally" and "want[ed] to do an application of all of the facts to the relocation factors that are specifically laid out and do the analysis like that," making "an analysis based upon the law and the facts that are before [the trial court] . . . ." The trial court instructed the parties to continue following the custody schedule, noting "[t]hat [has not] been modified. . . . There is no judgment that has modified that. [That is] what you ought to be complying with and [that is] what I expect to be happening." Reiterating, the trial court stated, "there is a [j]udgment in place and I expect it to be followed." On this point, the trial court further stated, "if there are hurdles that have to be overcome, I expect you all to overcome those hurdles[] because this is [what is] in place."

## Relocation Judgment

On December 22, 2022, the trial court held another hearing and orally rendered judgment on Ms. Narcisse's Motion to Relocate. At the outset, the trial court observed that because Ms. Narcisse was the party seeking relocation, she had the burden of proof to show that her proposed relocation was made in good faith and was in the best interest of the children. The trial court explained that it found Ms. Narcisse made her request in good faith, such that the sole remaining issue was whether Ms. Narcisse also demonstrated that relocation was in the best interest of Ma.T and Mo.T.

The trial court then explained that statutory and jurisprudential law required the trial court to apply all of the relocation factors of La. R.S. 9:355.14 to the facts of the case. The trial court began by listing reasons for its decision without referencing specific factors. In this regard, the trial court noted that while Ms. Narcisse contended that Mr. Thomas could find a job in Jacksonville and relocate there, Mr. Thomas testified that he would not relocate to Jacksonville if the trial court granted Ms. Narcisse's Motion to Relocate. Next, the trial court explained that Mr. Narcisse had not offered any evidence to prove that relocation was in the children's best interest. To this end, the trial court stated, "the facts as testified to were just that, it was testimony. There was no evidence to indicate the quality of the children's school when they resided in the Greater New Orleans area versus the quality of the school where they are currently attending." Regarding the Jacksonville schools, the trial court noted that Ms. Narcisse simply testified that the children liked their current schools and schoolmates but that there was "no third-party evidence to demonstrate any differences or changes or to make a

11

determination . . . as to whether or not the school where they are currently residing is in their best interest."

The trial court also noted that the testimony established that Ms. Narcisse and Mr. Thomas had not been regularly following the established custody schedule. The trial court observed, however, that Mr. Thomas had demonstrated an ability to co-parent with Ms. Narcisse. As an example, the trial court noted that Mr. Thomas informed Ms. Narcisse that he would be unable to exercise his physical custody for twelve weeks while training for work but would contact her at the end of training to resume the custody schedule. The trial court further noted that it was during this time that Ms. Narcisse relocated on an emergency basis with the children, but the trial court stated that it did "not hold [this] against" Ms. Narcisse given the circumstances. Additionally, the trial court stated that "[t]here has been no testimony as to substance abuse." The trial court explained all of that without referencing particular relocation factors.

The trial court then listed other reasons factoring into its decision and referenced specific relocation factors during this explanation. The trial court stated that "there was little testimony as to the second factor in the statute," which pertains to "[t]he age, developmental stage, needs of the child, and the likely impact the relocation will have on the child's physical, educational, and emotional development." La. R.S. 9:355.14(A)(2). The trial court then discussed the third factor, which concerns "the feasibility of preserving a good relationship between the non-relocating person and the child through suitable physical custody or visitation arrangements, considering the logistics and financial circumstances of the parties." La. R.S. 9:355.14(A)(3). Regarding the third factor, the trial court stated, "[t]here was some testimony as to the [t]hird [f]actor, but mostly as it

12

relates to Ms. [Narcisse]'s ability to preserve a relationship with the children and the flexibility that the new position she had obtained with a higher salary provided for her to be able to do things with the children."

Turning to the fourth factor, which La. R.S. 9:355.14 (A)(4) lists as "[t]he child's views about the proposed relocation," the trial court explained, "there was some testimony through Ms. [Narcisse] as to what the children may have communicated directly to her, but . . . the [c]ourt did not hear testimony directly from the children themselves, although that is not a requirement." Further, the trial court stated, "[a]nd while there was testimony as to how the relocation would affect the general quality of life, and that Ms. [Narcisse] has a position that provides her with a significantly higher income that would then allow the children to reside in a home that . . . would allow them a more comfortable space than that which they had when they were here in the Greater New Orleans area," Ms. Narcisse "provided limited testimony as to why she was seeking relocation for the benefits of the children, but more so why she was seeking relocation for herself."

Discussing the ninth factor, which relates to "[t]he extent to which the objecting person has fulfilled his financial obligations to the person seeking relocation, including child support," the trial court noted that there was some "testimony about Mr. Thomas'[] failure to fulfill his financial obligations to Ms. [Narcisse]." The trial court further stated, however, "that Mr. Thomas provided information that indicated that the arrears as first alleged were not actually what the state indicated his arrears to be." Referencing the twelfth and final factor, the trial court stated, "[a]nd the Court notes that there is the 12th provision [which] is, to a certain extent, a catch all that allows the Court to consider anything else that it deems might be in the best interest of the children."

Ultimately, the trial court concluded that Ms. Narcisse did not meet her burden of demonstrating that relocation was in the best interest of Ma.T. and Mo.T. Accordingly, the trial court orally denied Ms. Narcisse's Motion to Relocate. The trial court then explained that it would not require Ms. Narcisse to move back to Louisiana immediately because this would disrupt the children in the middle of the school year, stating "the [c]ourt is not going to require the children to return prior to the end of the current school year." The trial court then asked whether anyone had any questions, but no one responded. At the close of the hearing, the trial court requested that counsel for Ms. Narcisse prepare a judgment to reflect the ruling.

On January 19, 2023, the trial court signed the Relocation Judgment, which counsel for Ms. Narcisse prepared. It denied Ms. Narcisse's Motion to Relocate and also stated, in pertinent part, "that as a result of the children residing in Florida, the Court will not require the children to return to Louisiana before the end of the school year." On February 27, 2023, Ms. Narcisse filed a Motion for Appeal regarding the trial court's denial of her Motion to Relocate, which the trial court granted.

**Mr. Thomas' Motion for Contempt**

On January 17, 2023, Mr. Thomas filed a Motion for Contempt. Therein, as the basis for Ms. Narcisse's alleged contempt, Mr. Thomas explained that on Friday, January 13, 2023, Ms. Narcisse informed him that she would not be bringing their daughters for his upcoming physical custody weekend, which was scheduled for January 14 and 15, 2023. Mr. Thomas alleged in his Motion for Contempt that Ms. Narcisse cited the financial toll on her due to the distance between Florida and Louisiana as the reason she would not be bringing their children.

14

On March 1, 2023, the trial court held a hearing on Mr. Thomas' Motion for Contempt. Mr. Thomas reiterated the allegations in his Motion for Contempt, contending that on January 13, 2023, Ms. Narcisse informed him that she would not be bringing the children for their upcoming, scheduled weekend with him, which was January 14 and 15, 2023.[5] Mr. Thomas further testified that he and Ms. Narcisse did not try to work out something else or make other arrangements for Mr. Thomas to be able to see the children. Mr. Thomas requested that the trial court merely enforce the custody arrangement, not impose a penalty on Ms. Narcisse.

Countering, Ms. Narcisse testified that she offered for Mr. Thomas to speak to their daughters "via FaceTime the entire weekend at any point in time that he wished, and he told [her,] [']no, that was not in the [c]ourt order.[']" Ms. Narcisse alleged that she offered Ma.T. and Mo.T. the opportunity to call Mr. Thomas that weekend but that they did not want to call. Conversely, Ms. Narcisse contended that Mr. Thomas did not attempt to contact their daughters that weekend. Additionally, Ms. Narcisse stated that she offered for Mr. Thomas to have their daughters for the entire week of spring break but that Mr. Thomas again responded that it was not in the court order but also "that his shoulder was messed up and that would not work for him." Ms. Narcisse testified that as another effort at accommodation, she asked Mr. Thomas about having the girls for twelve hours in one day so that she would not have to incur hotel expenses in New Orleans by

_____

[5] Additionally, Mr. Thomas alleged that Ms. Narcisse continued to not answer the phone when he called to speak to their daughters; advised their daughters to tell him they were busy eating or taking a bath when he called; or did not have their daughters return his calls. Mr. Thomas did not raise any of this in his Motion for Contempt though, so the trial court did not consider these claims.

15

spreading his time with the girls over both Saturday and Sunday, but Ms. Narcisse explained that Mr. Thomas turned down that offer too.

Counsel for Ms. Narcisse[6] argued that for Ms. Narcisse to be held in contempt there would have to be a lawful judgment that she violated. Ms. Narcisse's counsel asserted that Ms. Narcisse had not violated a lawful judgment because the Relocation Judgment stated that the trial court would not require the children to return to Louisiana before the end of the school year and that this "superseded the August 2020 [Consent] [J]udgment because [the judgments were] inconsistent." Further, counsel for Ms. Narcisse contended that even if the trial court were to find Ms. Narcisse in contempt, Ms. Narcisse had justifiable excuses for violating the custody schedule, again citing the alleged inconsistency of the judgments and also asserting the financial infeasibility of the custody schedule for Ms. Narcisse. In this latter regard, Ms. Narcisse's counsel alleged that Ms. Narcisse incurred an additional $1,000 per month in travel expenses that she could spend on their daughters instead. Additionally, counsel for Ms. Narcisse contended that during the January 2023 weekend in question "hotel rates had increased significantly, so she simply [could not] make the visit" because Mr. Thomas rejected Ms. Narcisse's offer to exercise his twelve hours of custody in one day.

In response, the trial court explained, "[t]he [Relocation] Judgment was speaking to [the children] retuning to Louisiana to reside permanently and re-enroll in school," and "[t]he purpose of the [Relocation] Judgment] was to not have the children have to leave their current school before the end of the school year." The trial court further stated, "the [Relocation] Judgment only addresses relocation. It

---

[6] The record reveals that after the trial court signed the Relocation Judgment, Ms. Narcisse switched attorneys.

does not in any way modify the previous Consent Judgment that was put into place by the parties." The trial court recalled that it had never indicated to the parties that they were no longer required to continue the physical custody periods agreed to previously. The trial court further recalled indicating on the record that the children would not be required to leave their schools and come back to Louisiana before the end of the school year. The trial court also noted that the Relocation Judgment had been prepared by Ms. Narcisse's prior counsel. Finally, the trial court noted that "[p]art of the reason for the relocation [request] . . . was because [Ms. Narcisse] was able to obtain . . . a similar position . . . at a fairly significantly higher salary," such that the trial court stated that it could not "take the argument that [Ms. Narcisse could not] afford [to bring the girls] as . . . reasonable grounds under the circumstances." The trial court explained that although it believed Ms. Narcisse attempted to coordinate other options with Mr. Thomas and minimize the impact of not bringing their daughters for Mr. Thomas' custody weekend, the trial court could not find Ms. Narcisse in compliance with the Consent Judgment. Accordingly, the trial court held Ms. Narcisse in contempt but ordered her only to comply with the custody schedule outlined in the Consent Judgment and pay Mr. Thomas' $47.00 filing fee associated with his Motion for Contempt.

On April 6, 2023, the trial court signed a judgment consistent with its oral ruling. That is, the trial court granted Mr. Thomas' Motion for Contempt; ordered Ms. Narcisse to reimburse Mr. Thomas the $47.00 filing fee that he paid for his Motion for Contempt; and awarded Mr. Thomas makeup visitation with Ma.T. and Mo.T. during their spring break. On April 10, 2023, Ms. Narcisse filed a "Supplemental and Amended Motion and Order for Appeal and Request for Stay of December 22, 2022 Judgment (signed January 19, 2023) and March 1, 2023

17

[Judgment] (signed April 6, 2023)". Therein, Ms. Narcisse not only sought an appeal of the Contempt Judgment but also a stay of the Relocation Judgment. On April 20, 2023, the trial court signed an order granting both of these requests.

## ASSIGNMENTS OF ERROR

On appeal, Ms. Narcisse asserts three assignments of error:

1. The trial court erred in failing to find the record evidence overwhelmingly supports a finding that relocation is in the minor children's best interest.

2. The trial court erred in holding Ms. Narcisse in contempt of court for failing to bring the minor children for a visit during [the] Mardi [Gras] season, when its own judgment states that the "the court will not require the children to return to Louisiana before the end of the school year."

3. The trial court erred in failing to find that in light of the conflicting provisions in its judgments, Ms. Narcisse had a justifiable excuse, precluding a finding of contempt.

For purposes of our discussion, we will begin with assignment of error number one and combine assignments of error numbers two and three. However, prior to addressing Ms. Narcisse's assignments of error, we begin with a preliminary matter.

## PRELIMINARY MATTER

### Contempt Judgment

Prior to "addressing the merits of an appeal, appellate courts have a duty to determine *sua sponte* whether a valid, final judgment has properly invoked their appellate jurisdiction." *LZM Props., LLC v. Priv. Connection Prop., Inc.*, 2023-0707, p. 12 (La. App. 4 Cir. 4/25/24), ___ So.3d ___, ___, 2024 WL 1793245, at *6 (citing *Safford v. New Orleans Fire Dep't*, 2023-0495, p. 18 (La. App. 4 Cir. 2/1/24), ___ So.3d ___, ___, 2024 WL 377791, at *9). In addition to the

18

Relocation Judgment, Ms. Narcisse also seeks review of the Contempt Judgment, which stated, in pertinent part:

> This matter came before the Court, via Zoom Conference, on March 1, 2023, pursuant to **MARC DAVID THOMAS'S** ("Mr. Thomas") Motion for Contempt ("Motion"), filed on January 17, 2023.
>
> . . . .
>
> **IT IS ORDERED, ADJUDGED, AND DECREED** that the Motion for Contempt is **GRANTED**.
>
> **IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that Ms. Narcisse shall not be liable for any contempt penalties other than to reimburse Mr. Thomas for the filing fee in the amount of **FORTY-SEVEN AND 00/100 DOLLARS ($47.00)**.

The judgment found Ms. Narcisse in contempt and ordered her to pay Mr. Thomas' filing fee (in relation to the Motion for Contempt), but it did not otherwise impose sanctions or other disciplinary action on Ms. Narcisse.

Regarding contempt judgments, this Court has held that "[a]ll contempt judgments are deemed final judgments, subject to immediate appeal." *Cambrie Celeste LLC v. Starboard Mgmt., LLC*, 2016-1318, pp. 9-10 (La. App. 4 Cir. 11/6/17), 231 So.3d 79, 85 (first citing *Stiltner v. Stiltner*, 2000-2079, p. 2 (La. App. 4 Cir. 11/08/00), 772 So.2d 909, 910; and then citing *Pittman Constr. Co. v. Pittman*, 1996-1079, 1498, p. 3 (La. App. 4 Cir. 3/12/97), 691 So.2d 268, 270). In *Cambrie Celeste LLC*, this Court explained that "before . . . amendments to La. C.C.P. art. 1915, courts considered a contempt judgment an interlocutory judgment." *Id.* at p. 10, 231 So.3d at 85 n.2 (citing *Stiltner*, 2000-2079, p. 1, 772 So.2d at 910). Louisiana Code of Civil Procedure Article 1915 pertains to partial final judgments. In particular, in *Cambrie Celeste LLC*, this Court was referring to the language in La. C.C.P. art. 1915(A)(6), which now provides:

A. A final judgment may be rendered and signed by the court, even though it may not grant the successful party or parties all of the relief prayed for, or may not adjudicate all of the issues in the case, when the court:

. . . .

(6) Imposes sanctions or disciplinary action pursuant to Article 191,[7] 863,[8] or 864[9] or Code of Evidence Article 510(G).[10]

That is, the statutory language provides that if a judgment imposes sanctions or disciplinary action, then it is immediately appealable as a partial, final judgment under La. C.C.P. art. 1915(A)(6). *See also Trahant v. Perez*, 2002-1414, p. 8 (La. App. 4 Cir. 3/19/03), 843 So.2d 479, 484 (explaining that La. C.C.P. art. 1915(A)(6) "now permits the appeal of a judgment that imposes sanctions or disciplinary action pursuant to La. C.C.P. art[s.] 191, 863, or 864," such that "all contempt judgments are now considered final judgments, subject to immediate

_____

[7] Providing for "[i]nherent judicial power," La. C.C.P. art. 191 states that "[a] court possesses inherently all of the power necessary for the exercise of its jurisdiction even though not granted expressly by law."

[8] Louisiana Code of Civil Procedure Article 863 pertains to the effect of signing a pleading and states that "the signature of an attorney or party shall constitute a certification." La. C.C.P. art. 863(B). In pertinent part, La. C.C.P. art. 863 also provides that "If . . . the court determines that a certification has been made in violation of the provisions of this Article," then "the court shall impose upon the person who made the certification or the represented party, or both, an appropriate sanction which may include an order to pay to the other party the amount of the reasonable expenses incurred because of the filing of the pleading, including reasonable attorney fees."

[9] Louisiana Code of Civil Procedure Article 864 states that "[a]n attorney may be subjected to appropriate disciplinary action for a wilful violation of any provision of Article 863, or for the insertion of scandalous or indecent matter in a pleading."

[10] Louisiana Code of Evidence Article 510 pertains to "[h]ealth care provider-patient privilege." In pertinent part, it provides that "[a]ny attorney who violates a provision of this Article shall be subject to sanctions by the court." La. C.E. art. 510(G).

appeal").[11] When a trial court requires a party to pay the other party's filing fee associated with the subject motion, this constitutes a sanction. *See Pierce v. Buck Kreihs Co.*, 2022-0848, p. 5 (La. App. 4 Cir. 7/31/23), 371 So.3d 534, 537-38 (listing that portion of the trial court's judgment ordering the plaintiff to pay the defendant's filing fee for the subject motion as one facet of the trial court's imposition of sanctions). Moreover, in *Thibodeaux v. Thibodeaux*, another family law case, the Louisiana Fifth Circuit Court of Appeal held that if the "contempt judgment complained of . . . is one for violation of an order of the court, it is final and therefore appealable." 1999-618, p. 1 (La. App. 5 Cir. 11/10/99), 748 So.2d 1180, 1181 (citing *Pittman Constr. Co.*, 1996-1079, p. 2, 691 So.2d at 269).

The trial court imposed a sanction on Ms. Narcisse in the Contempt Judgment by ordering her to pay Mr. Thomas's $47.00 filing fee associated with his Motion for Contempt. Additionally, the trial court concluded that Ms. Narcisse had violated an order of the Court, i.e. the Consent Judgment. Thus, in light of La. C.C.P. art. 1915(A)(6) and the foregoing jurisprudence, the trial court's Contempt Judgment was a final judgment subject to immediate appeal, and this Court has jurisdiction to review it. Next, we turn to Ms. Narcisse's first assignment of error regarding the Relocation Judgment.

## DISCUSSION

### Assignment of Error Number One: The Relocation Judgment

In her first assignment of error, Ms. Narcisse argues that "[t]he trial court erred in failing to find the record evidence overwhelmingly supports a finding that

---

[11] We note, however, that in *Yokum v. Nicholas S. Karno, II, Inc.*, this Court more narrowly held that "a finding of contempt, without imposing either monetary or criminal sanctions, is a non-appealable interlocutory judgment." 2012-1656, 1736, p. 4 (La. App. 4 Cir. 10/23/13), 126 So.3d 723, 727.

relocation is in the minor children's best interest." At the outset, Ms. Narcisse argues that this Court should apply the *de novo* standard of review in considering the trial court's judgment on her Motion to Relocate because the trial court abused its discretion and committed legal errors that interdicted its fact-finding process. In particular, Ms. Narcisse asserts that although the trial court correctly found her request to relocate to be in good faith, the trial court had no reasonable factual basis to deny her Motion to Relocate because the record evidence clearly supports a finding that relocation is in the children's best interest. Ms. Narcisse alleges that the trial court erred in failing to expressly make a factual finding on every factor in its determination that relocation was not in the best interest of Ma.T. and Mo.T. Further, Ms. Narcisse contends that all twelve relocation factors found in La. R.S. 9:355.14 favor her. With Ms. Narcisse's arguments in mind, we begin by listing the relocation principles and factors and by considering the standard of review applicable to relocation judgments.

### *Relocation Principles and Standard of Review*

Louisiana Revised Statutes 9:355.10 establishes that "[t]he person proposing relocation has the burden of proof that the proposed relocation is made in good faith and is in the best interest of the child." As the Louisiana Supreme Court has explained, "by placing this two-part burden on the relocating parent and placing no burden on the nonrelocating parent, the legislature chose to assign a very heavy burden to the relocating parent to prove that relocation is in the best interest of the child." *Gathen v. Gathen*, 2010-2312, p. 10 (La. 5/10/11), 66 So.3d 1, 8 (citing *Curole v. Curole*, 2002-1891, p. 5 (La. 10/15/02), 828 So.2d 1094, 1097). While, "the person proposing relocation has the burden to prove that the relocation attempt is made both in good faith and in the best interest of the child, there is no

22

presumption in favor of or against relocation of the child's residence." *Owens v. Owens*, 2014-165, p. 3 (La. App. 3 Cir. 6/4/14), 140 So.3d 865, 866-67 (quoting La. R.S. 9:355.10, Comment (a)—2012 Revision). If a relocation is contested in accordance with La. R.S. 9:355.7,[12] as in this matter, then "the person wishing to relocate must prove by a preponderance of the evidence, on contradictory hearing, that relocation meets the good faith and best interest standards." *Id.*

Louisiana Revised Statutes 9:355.14 lists the factors that a court considers in determining whether relocation is in the best interest of the child(ren). Specifically, a court must consider:

> (1) The nature, quality, extent of involvement, and duration of the relationship of the child with the person proposing relocation and with the non-relocating person, siblings, and other significant persons in the child's life.

> (2) The age, developmental stage, needs of the child, and the likely impact the relocation will have on the child's physical, educational, and emotional development.

> (3) The feasibility of preserving a good relationship between the non-relocating person and the child through suitable physical custody or visitation arrangements, considering the logistics and financial circumstances of the parties.

> (4) The child's views about the proposed relocation, taking into consideration the age and maturity of the child.

> (5) Whether there is an established pattern of conduct by either the person seeking or the person opposing the relocation, either to promote or thwart the relationship of the child and the other party.

> (6) How the relocation of the child will affect the general quality of life for the child, including but not limited to financial or emotional benefit and educational opportunity.

> (7) The reasons of each person for seeking or opposing the relocation.

---

[12] Louisiana Revised Statutes 9:355.7 is titled "Objection to relocation of child" and outlines the process for so objecting.

(8) The current employment and economic circumstances of each person and how the proposed relocation may affect the circumstances of the child.

(9) The extent to which the objecting person has fulfilled his financial obligations to the person seeking relocation, including child support, spousal support, and community property, and alimentary obligations.

(10) The feasibility of a relocation by the objecting person.

(11) Any history of substance abuse, harassment, or violence by either the person seeking or the person opposing relocation, including a consideration of the severity of the conduct and the failure or success of any attempts at rehabilitation.

(12) Any other factors affecting the best interest of the child.

La. R.S. 9:355.14(A).

Of note, La. R.S. 9:355.14 states that "the court *shall* consider all relevant factors in determining whether relocation is in the best interest of the child, including the" above list. (Emphasis added.) Use of the word "shall" indicates that consideration of the factors is mandatory. *See Everett v. Air Prods. & Chems., Inc.*, 2022-539, 0540, 0541, p. 10 (La. App. 4 Cir. 5/2/23), ___ So.3d ___, ___, 2023 WL 3193154, at *5 (noting that "[u]nder well-established rules of interpretation, the word 'shall' excludes the possibility of being 'optional' or even subject to 'discretion,' but instead means 'imperative, of similar effect and import with the word 'must'" (quoting *Auricchio v. Harriston*, 2020-01167, p. 4 (La. 10/10/21), 332 So.3d 660, 663)). However, while a trial court is "required to consider all 12 factors in conducting its best interest analysis," the trial court is "permitted to weigh some factors more heavily than others." *Coulon v. Coulon*, 2022-0619, p. 7 (La. App. 4 Cir. 11/9/22), 351 So.3d 823, 828-29 (citing *Gathen*, 2010-2312, p. 13, 66 So.3d at 10).

Regarding the standard of review in relocation matters, in *Gathen*, the Louisiana Supreme Court granted the writ application filed therein "to determine the appropriate standard of review of a trial court's decision in a child relocation case, where the trial court does not expressly analyze each factor . . . in determining whether relocation is in the best interest of the child." 2010-2312, p. 1, 66 So.3d at 2. The Louisiana Supreme Court concluded that while a trial court must consider all twelve relocation factors, "its failure to expressly analyze each factor in its written or oral reasons does not constitute an error of law such that *de novo* review is appropriate." *Id.* So long as "it can be determined that the trial court considered the factors, *de novo* review is inappropriate." *Id.* at p. 12, 66 So.3d at 9. In particular, "the trial court is not required to expressly analyze each factor in its oral or written reasons for judgment in a relocation case" because the relocation statutes do not expressly require the trial courts to do so. *Id.* The Louisiana Legislature would have provided in the relocation statutes that the trial court must expressly analyze each and every factor in either oral or written reasons if the Legislature had so intended. *Id.* Further, "a trial court is never required to give oral reasons and is not required to give written reasons for its 'findings of fact and reasons for judgment' unless requested by a party in most types of non-jury cases." *Id.* (citing La. C.C.P. art. 1917).

Instead, as long as the appellate court determines that the trial court considered the relocation factors, then "the trial court's relocation determination is entitled to great weight and will not be overturned absent a clear showing of abuse of discretion." *Gathen*, 2010-2312, p. 13, 66 So.3d at 9. *See also Coulon*, 2022-0619, p. 7, 351 So.3d at 828 (citing *Curole*, 2002-1891, p. 4, 828 So.2d at 1096); and *Durand v. Rose*, 2022-0300, p. 9 (La. App. 4 Cir. 9/15/22), 366 So.3d 484, 492

25

(quoting *State ex rel. Dep't of Soc. Servs. v. Whittington*, 2015-1118, 1119, p. 3 (La. App. 4 Cir. 5/18/16), 193 So.3d 1234, 1237). In *Gathen*, the Louisiana Supreme Court explained that the abuse of discretion standard applies because the trial court "is in a better position to evaluate the best interests of the children from [the court's] total overview of the conduct and character of the parties and the children and of community standards." 2010-2312, p. 10, 66 So.3d at 8 n.4 (quoting *Fulco v. Fulco*, 259 La. 1122, 1129, 254 So.2d 603, 605 (1971)). In *Gathen*, the Louisiana Supreme Court acknowledged that "a trial court's failure to expressly analyze each factor makes appellate review for abuse of discretion somewhat difficult." *Id.* at p. 13, 66 So.3d at 10. Accordingly, the Louisiana Supreme Court instructed that "upon review, it is appropriate for a reviewing court to look to the reasons and factors the trial court did expressly take into account in reaching its ultimate determination, and, for the factors the trial court did not expressly discuss, it is appropriate for the reviewing court to determine whether the trial court's failure to give weight to these factors led the court to abuse its discretion in reaching its ultimate determination on relocation." *Id.* When an appellate court reviews a trial court's relocation decision for an abuse of discretion, the appellate court "must accept each factual finding the district court made in arriving at its conclusion, unless a particular factual finding is manifestly erroneous." *Durand*, 2022-0300, p. 10, 366 So.3d at 492 (quoting *Whittington*, 2015-1118, 1119, p. 3, 193 So.3d at 1237). Absent an abuse of discretion, the appellate court cannot reverse the trial court's decision on relocation.

We note that at the close of the December 15, 2022 hearing, the trial court judge advised the parties that she would take the matter under advisement because she "need[ed] to deliberate on this personally" and "want[ed] to do an application

26

of all of the facts to the relocation factors that are specifically laid out and do the analysis like that," making "an analysis based upon the law and the facts that are before [the trial court] . . . ." Then, at the start of the December 22, 2022 hearing, the trial court explained that statutory and jurisprudential law required the trial court to apply all of the relocation factors of La. R.S. 9:355.14 to the facts involved. The trial court orally explained the reasons factoring into its decision to deny Ms. Narcisse's Motion to Relocate, in some instances referencing the evidence or lack thereof for certain factors while also discussing reasons for the decision without reference to specific factors. Additionally, we note that neither Ms. Narcisse nor Mr. Thomas filed a request for written reasons in the trial court, so the trial court was not required to provide reasons for its Relocation Judgment and express its finding on all twelve factors. Thus, contrary to Ms. Narcisse's argument, we find that the trial court considered the La. R.S. 9:355.14 relocation factors, such that *de novo* review of the Relocation Judgment is inappropriate. Accordingly, we review the trial court's Relocation Judgment for an abuse of discretion as directed by the Louisiana Supreme Court in *Gathen*.

***Whether the Trial Court Abused Its Discretion***

Ms. Narcisse asserts that the trial court erred in finding that she failed to satisfy her burden of proof that the proposed relocation is in the best interest of the children. As previously stated, the relocation statutes also require a finding of good faith on the part of the party seeking to relocate. In this matter, the trial court found that Ms. Narcisse's Motion to Relocate was brought in good faith, and neither party assigns error to the trial court's finding of good faith. Therefore, we pretermit discussion of the good faith requirement and focus instead on the best interest requirement.

27

The first factor in La. R.S. 9:355.14 is "[t]he nature, quality, extent of involvement, and duration of the relationship of the child with the person proposing relocation and with the non-relocating person, siblings, and other significant persons in the child's life." The trial court did not specifically reference this factor in its explanation for its decision. The trial court was aware of the custody arrangement in the Consent Judgment, which made Ms. Narcisse the domiciliary parent. The Consent Judgment and the record indicate that Ms. Narcisse was the primary caretaker for the children as evidenced by her testimony that she brought the children to school and to gymnastics, as well as by the sheer fact that Ma.T. and Mo.T. spent the majority of their time each month with Ms. Narcisse as opposed to the hours they spent on alternating weekends with Mr. Thomas. The testimony revealed that Mr. Thomas lived with his grandmother in New Orleans and that Mr. Thomas' grandmother had a relationship with Ma.T. and Mo.T. When asked about her support system in Jacksonville, Ms. Narcisse cited her fiancé and the fact that he brought Ma.T. and Mo.T. to school for her.

The second factor is "[t]he age, developmental stage, needs of the child, and the likely impact the relocation will have on the child's physical, educational, and emotional development." During the December 22, 2022 hearing, the trial court specifically referenced this factor, stating "there was little testimony as to the second factor in the statute." We agree with the trial court that there was little testimony or evidence about Ma.T.'s and Mo.T's developmental stages, needs, and the likely impact of relocation on each of them physically, educationally, and emotionally. From the educational standpoint, Ms. Narcisse simply stated that Mo.T. attended daycare in Jacksonville. Regarding Ma.T.'s Jacksonville school, Ms. Narcisse testified, "I love it and [she] loves it," noting that the principal knows

28

the students' names and Ma.T. had already made friends at the school. Ms. Narcisse further explained that she liked the Jacksonville school better because the teachers were in contact with her daily; Ma.T. was "challenged and . . . her grades [we]re not just given to her;" the school hosted nights for parents on various topics, such as crime and safety; and the school's addition of a middle school program would allow Ma.T. to remain there in the future. Ms. Narcisse also stated that she was looking into a magnet program for Ma.T. for middle school. However, Ms. Narcisse neither provided information about Ma.T.'s and Mo.T's New Orleans school, Bricolage Academy, nor explained how Bricolage Academy differed from the programs in Jacksonville. That is, for example, Ms. Narcisse did not clearly explain if the aspects of Ma.T.'s Jacksonville school that she liked were absent from Bricolage Academy or provide reasons she was displeased with Bricolage Academy. As the trial court summarized, there was "no third-party evidence to demonstrate any differences or changes or to make a determination . . . as to whether or not the school where they are currently residing is in their best interest."

The third relocation factor is "[t]he feasibility of preserving a good relationship between the non-relocating person and the child through suitable physical custody or visitation arrangements, considering the logistics and financial circumstances of the parties." Specifically referring to the third factor, the trial court stated, "[t]here was some testimony as to the [t]hird [f]actor, but mostly as it relates to Ms. [Narcisse]'s ability to preserve a relationship with the children and the flexibility that the new position she had obtained with a higher salary provided for her to be able to do things with the children." Though not specifically referencing the third factor when making this statement, the trial court found that Mr. Thomas had demonstrated an ability to co-parent with Ms. Narcisse but that

29

the testimony established that Ms. Narcisse and Mr. Thomas were not following the established custody schedule. We agree with this finding: the testimony indicated that the parties had not abided by the phone call schedule established by the trial court and that Mr. Thomas was not taking Ma.T. and Mo.T. every other weekend as established in the Consent Judgment. Additionally, Mr. Thomas testified during the relocation hearing that he was unemployed, thus indicating a likely inability on his part to financially afford to travel to Jacksonville to spend time with Ma.T. and Mo.T. or even to meet Ms. Narcisse halfway as she proposed. While Ms. Narcisse testified that her Jacksonville job provided her with a higher salary, she did not indicate a willingness to spend the extra money on facilitating a relationship with Ma.T. and Mo.T. In fact, Ms. Narcisse testified that she sought alternative options, such as meeting Mr. Thomas halfway for exchanges or having Mr. Thomas exercise his custody hours over the course of one day so that she would not have to expend money on a hotel room.[13]

The fourth factor is "[t]he child's views about the proposed relocation, taking into consideration the age and maturity of the child." Discussing this factor, the trial court observed that Ms. Narcisse testified about information that Ma.T. and Mo.T. might have communicated to her, but this was secondhand information. We also note that Ms. Narcisse's testimony about why Ma.T. and Mo.T. liked Jacksonville was, for the most part, general in nature. For example, Ms. Narcisse

_____

[13] Moreover, we note that the basis for Mr. Thomas' Motion for Contempt, which will be discussed more fully in the next section, was that Ms. Narcisse did not bring Ma.T. and Mo.T. for a scheduled weekend with Mr. Thomas, citing financial difficulty in doing so. Though this occurred after the trial court rendered the Relocation Judgment, such that this information was not before the trial court when it decided to deny Ms. Narcisse's Motion to Relocate, we find that this situation speaks to the third factor. Specifically, it indicates an example of a problem with the feasibility of preserving Mr. Thomas' relationship with Ma.T. and Mo.T. if Ma.T. and Mo.T were to remain in Jacksonville.

testified that "[t]he girls love Jacksonville, everything about it" and that Ma.T. loved her Jacksonville school. When asked to cite additional reasons for her statement (on top of her earlier contentions about Ma.T. making friends at school and the girls having a park in their neighborhood), Ms. Narcisse stated, "[Mo.T.] [cannot] wait for Fun Friday. [That is] what we call our Fridays, Fun Friday. We do something every weekend." However, Ms. Narcisse did not elaborate as to how or if their weekend activities in Jacksonville differed from their weekends while living in New Orleans. One difference about downtime in Jacksonville that Ms. Narcisse cited was that her daughters "[cannot] wait to get to the beach when it opens up. [Mo.T.] asks every weekend." Additionally, we note that Ms. Narcisse did not testify as to whether Ma.T. and Mo.T. expressed any feelings—either positive or negative—about leaving and being away from New Orleans.

The fifth factor is "[w]hether there is an established pattern of conduct of the parent seeking the relocation, either to promote or thwart the relationship of the child and the nonrelocating party." Though the trial court did not specifically reference this factor, the trial court noted that the testimony established that Ms. Narcisse and Mr. Thomas had not been regularly following the established custody schedule. Additionally, as previously stated, the testimony indicated that the phone call schedule set by the trial court had not been followed, with Mr. Thomas contending that Ms. Narcisse did not have their daughters call him at a different time if the children were busy when he called.

The sixth factor is "[h]ow the relocation of the child will affect the general quality of life for the child, including but not limited to financial or emotional benefit and educational opportunity." Again, the trial court did not specifically reference this factor during the hearing. Financially speaking, however, the trial

court did recognize "the flexibility that the new position [Ms. Narcisse] had obtained with a higher salary provided for her to be able to do things with the children." The trial court also stated, "there was testimony as to how the relocation would affect the general quality of life, and that Ms. [Narcisse] has a position that provides her with a significantly higher income that would then allow the children to reside in a home that . . . would allow them a more comfortable space than that which they had when they were here in the Greater New Orleans area." The testimony about Ma.T.'s and Mo.T.'s emotional state concerning the relocation was limited with Ms. Narcisse contending that they "love" Jacksonville but without going into much detail about their thoughts on moving there and leaving New Orleans. Regarding Ma.T.'s and Mo.T.'s educational well-being, as the trial court correctly explained, "[t]here was no evidence to indicate the quality of the children's school when they resided in the Greater New Orleans area versus the quality of the school where they are currently attending." Moreover, Ms. Narcisse cited crime concerns in New Orleans as part of her desire to move away, but she did not provide the trial court with information about the crime in the area of Jacksonville where she had relocated. Instead, she merely testified that she had not heard gunshots from her Jacksonville house.

The seventh relocation factor is "[t]he reasons of each person for seeking or opposing the relocation." Though the trial court did not specifically identify this factor by number while explaining its reasons for judgment, the trial court considered relevant testimony from both Ms. Narcisse and Mr. Thomas. Ms. Narcisse testified that she sought to relocate because she "wanted to get . . . [her] kids into a better environment." Ms. Narcisse elaborated by citing the city, the school system, the pay grade, and the crime when asked what was wrong with her

environment in New Orleans. Mr. Thomas testified that he opposed the relocation because the extra money Ms. Narcisse was making in Jacksonville was not worth it because it mean his daughters would not be in his life.

The eighth relocation factor pertains to "[t]he current employment and economic circumstances of each person and how the proposed relocation may affect the circumstances of the child." Again, the trial court did not specifically identify this factor by number when explaining its reasons for judgment, but the court recognized that Ms. Narcisse's Jacksonville job provided her with a higher salary. We note, however, that there was little information about how far this higher salary went in Jacksonville. That is, when asked about the cost of living in Jacksonville, Ms. Narcisse merely replied that it was not much higher than New Orleans without providing any more specific information. Thus, Ms. Narcisse's higher salary has the potential to provide Ma.T. and Mo.T. with a better situation economically speaking, but Ms. Narcisse provided no evidence to substantiate this. Additionally, as mentioned previously, Mr. Thomas testified at the time of the hearing that he was unemployed. Thus, his ability to visit the girls in Jacksonville was likely limited by his economic circumstances.

The ninth relocation factor relates to "the extent to which the objecting person has fulfilled his financial obligations to the person seeking relocation, including child support, spousal support, and community property, and alimentary obligations." The trial court specifically referenced this factor, stating there was some "testimony about Mr. Thomas'[] failure to fulfill his financial obligations to Ms. Narcisse" but "that Mr. Thomas provided information that indicated that the arrears as first alleged were not actually what the state indicated his arrears to be." Based on the trial court's statement about Mr. Thomas' arrears being inaccurate,

the trial court found Mr. Thomas' testimony credible. We further note that the information about whether Mr. Thomas was current on his child support payments consisted purely of conflicting testimony: Ms. Narcisse contended that Mr. Thomas had not been paying, while Mr. Thomas alleged that he was paying. Neither party entered evidence into the record to support their position.

The tenth factor is "the feasibility of a relocation by the objecting person." Though the trial court did not reference this factor, at the outset of the December 22, 2022 hearing, the trial court recalled Mr. Thomas' testimony that he would not relocate to Jacksonville even if the trial court granted Ms. Narcisse' Motion to Relocate. Mr. Thomas merely testified that he would not move but did not state any particular reason or reasons as to why it was not feasible for him. While Ms. Narcisse contended that Mr. Thomas could find a job in Jacksonville and relocate there because the company for whom he worked had locations there, she did not provide proof of same or demonstrate that the company had openings equivalent to Mr. Thomas' job with the company in New Orleans. Moreover, the record indicates that prior to Ms. Narcisse's move to Jacksonville, Mr. Thomas was in a twelve-week training program, so it is unclear if he was still employed by the same company. The testimony further revealed that Mr. Thomas had suffered a shoulder injury and was not working at the time of the hearing.

The eleventh factor is "[a]ny history of substance abuse, harassment, or violence by either the person seeking or the person opposing relocation, including a consideration of the severity of the conduct and the failure or success of any attempts at rehabilitation." The trial court did not discuss this factor. Ms. Narcisse testified that she had filed a Petition for Protection from Abuse against Mr. Thomas. The record before this Court demonstrates that Ms. Narcisse filed a

34

"Petition for Protection from Abuse" on February 12, 2020; and the trial court held a hearing on her petition on August 11, 2020. The trial court signed an order that same day that prohibited Mr. Thomas from going within one-hundred yards of Ms. Narcisse; ordered Mr. Thomas to stay away from Ms. Narcisse's place of employment and not to interfere with her employment; issued a civil injunction prohibiting Mr. Thomas from harassing Ms. Narcisse in any manner; and prohibited Mr. Thomas from contacting Ms. Narcisse by any means. Importantly, however, the order also dismissed Ms. Narcisse's Petition for Protection from Abuse with prejudice. The Judgment of Dismissal stated that Ms. Narcisse's petition had been dismissed with prejudice for "petitioner's failure to prove by the appropriate standard the allegations contained in the Petition For Protection From Abuse." Moreover, we note that the trial court judge who signed this order is the same judge who rendered the Relocation Judgment, so the trial court judge was familiar with Narcisse's allegations when considering the La. R.S. 9:355.14 relocation factors.

The twelfth and final factor is "[a]ny other factors affecting the best interest of the child." The trial court described this as "a catch all that allows the [c]ourt to consider anything else that it deems might be in the best interest of the children." The trial court did not expressly list any other considerations under the twelfth factor though.

Based on our review of the record, we conclude that the trial court did not abuse its discretion in denying Ms. Narcisse's Motion to Relocate. The trial court's determination of the children's best interest was based heavily on its factual findings as determined from the trial court's ability at the December 15, 2022 hearing "to evaluate the best interests of the children from [its] total overview of

the conduct and character of the parties and the children and of community standards." *Gathen*, 2010-2313, p. 10, 66 So.3d at 8 n.4. The trial court expressly analyzed certain factors and listed other reasons that it felt were decisive in concluding that relocation was not in the best interest of the children. In particular, the trial court emphasized that Mr. Thomas would not relocate to Jacksonville, such that facilitating Ma.T.'s and Mo.T.'s relationship with him will likely be difficult. The trial court also emphasized that Ms. Narcisse had not met her burden of proof because she failed to offer evidence that relocation was in the best interest of the children as opposed to just herself. We agree: Ms. Narcisse did not provide evidence to substantiate her claims about Jacksonville being better for her daughters, and her testimony about Ma.T. and Mo.T. provided little to no specific information about how they felt being in Jacksonville versus New Orleans. Nothing in the record or in the trial judge's reasons leads us to believe that the trial court abused its discretion in determining that relocation would not be in the best interest of Ma.T. and Mo.T. Therefore, we affirm the trial court's Relocation Judgment.

Having so affirmed, however, and noting that the trial court's Relocation Judgment is currently stayed, we recognize the same problem that the trial court did: Ma.T. and Mo.T. may still be finishing their school year in Jacksonville. Accordingly, we remand this matter to the trial court for a specific date as to when Ms. Narcisse must relocate to New Orleans with Ma.T. and Mo.T. Our decision in no way affects the parties' Consent Judgment and the custody schedule therein established.

**<u>Assignments of Error Numbers Two and Three: The Contempt Judgment</u>**

In her second assignment of error, Ms. Narcisse argues that "[t]he trial court erred in holding Ms. Narcisse in contempt of court for failing to bring the minor children for a visit during Mardi [Gras] season, when its own judgment states that the 'the court will not require the children to return to Louisiana before the end of the school year.'" Then, in her third assignment of error, Ms. Narcisse contends that "[t]he trial court erred in failing to find that in light of the conflicting provisions in its judgments, Ms. Narcisse had a justifiable excuse, precluding a finding of contempt." We begin with the principles and standard of review applicable to contempt findings.

"A contempt of court is any act or omission tending to obstruct or interfere with the orderly administration of justice, or to impair the dignity of the court or respect for its authority." La. C.C.P. art. 221. A contempt of court can be direct or constructive. *Id.* "A direct contempt of court is one committed in the immediate view and presence of the court and of which it has personal knowledge, or a contumacious failure to comply with a subpoena or summons, proof of service of which appears of record." La. C.C.P. art. 222. "A constructive contempt of court is any contempt other than a direct one." La. C.C.P. art. 224. Constructive contempt includes "[w]ilful disobedience of any lawful judgment, order, mandate, writ, or process of the court." La. C.C.P. art. 224(2). Further, if a court concludes "that a person willfully disobeyed a lawful judgment in violation of La. C.C.P. art. 224(2)," then this "must be based on a finding that the accused violated an order of the court 'intentionally, purposely, and without justifiable excuse.'" *Treas v. Koerner*, 2019-0390, p. 19 (La. App. 4 Cir. 11/13/19), 364 So.3d 55, 68 (quoting *State through Dep't of Child. & Fam. Servs. Child Support Enf't v. Knapp*, 2016-

0979, p. 13 (La. App. 4 Cir. 4/12/17), 216 So.3d 130, 140). As this Court has previously explained, "[t]he trial court is vested with great discretion in determining whether a party should be held in contempt for disobeying a court order and the court's decision should be reversed only when the appellate court discerns an abuse of that discretion." *Barak*, 2021-0756, 0757, 0758, 0759, p. 16 (La. App. 4 Cir. 10/12/22), 367 So.3d 656 at 666 (alteration in original) (quoting *Macquet v. Macquet*, 2019-1097, p. 2 (La. App. 4 Cir. 10/7/20), 306 So.3d 498, 499).

The Contempt Judgment in this matter constitutes constructive contempt of court because the trial court concluded that Ms. Narcisse violated the Consent Judgment. Accordingly we must consider whether the trial court abused its discretion in finding that Ms. Narcisse willfully disobeyed that lawful judgment and did so intentionally, purposely, and without justifiable excuse. In family law matters, unless and until a judgment specifically changes the established custody or visitation schedule, that custody or visitation schedule remains in force even if circumstances make it more difficult to implement. *See Belway v. Thyssen*, 2018-0455, 0723 (La. App. 4 Cir. 12/12/18), 318 So.3d 766. In *Belway*, this Court considered the trial court's judgment granting a motion for contempt filed by the defendant-father, Gregory Neal Thyssen ("Mr. Thyssen"), against the plaintiff-mother, Shakti Belway ("Ms. Belway"). *Id.* at p. 1, 318 So.3d at 769. In October 2016, Mr. Thyssen and Ms. Belway entered into a consent judgment governing custody that stated, in pertinent part, that Ms. Belway would have physical custody and domiciliary status but that Mr. Thyssen could exercise "parenting time on at least two occasions per week and not less than twenty-five (25) hours per month with [their child]." *Id.* at p. 2, 318 So.3d at 770. The consent judgment further

stated that if either parent wished to move from New Orleans, Louisiana, that parent would give the other parent thirty days' notice. *Id.* Less than one month after the parties entered into the consent judgment, Ms. Belway informed Mr. Thyssen that she intended to move with their child from New Orleans to Santa Barbara, California; and Mr. Thyssen did not object to the relocation, but he subsequently filed a rule for contempt contending that Ms. Belway had not abided by their visitation schedule after her move to Santa Barbara. *Id.* The trial court granted Mr. Thyssen's rule for contempt, and this Court affirmed. *Id.* at pp. 1, 3, 318 So.3d at 769-70. In pertinent part, this Court pointed out that Ms. Belway had filed no pleadings with the trial court seeking to modify custody or visitation, thereby meaning the consent judgment was still in place. *Id.* at p. 6, 318 So.3d at 772. Additionally, this Court found no legal support for Ms. Belway's argument that "because [Mr. Thyssen] consented to [Ms. Belway]'s relocation, 'knowing that the move would vitiate the specific terms of his visitation schedule as set forth in the consent judgment[,] he is equitably estopped from enforcing those terms.'" *Id.* (third alteration in original).

We find *Belway* similar to the matter *sub judice*. As in *Belway*, the Relocation Judgment did not alter the custody arrangement established by the parties in the Consent Judgment. Accordingly, the custody schedule remained in effect after the Relocation Judgment, and Ms. Narcisse was bound by the Consent Judgment. Like Ms. Belway, Ms. Narcisse did not file a pleading in the district court to modify custody in light of her relocation to Jacksonville, so Ms. Narcisse should have known that she still needed to abide by the Consent Judgment. Additionally, even though neither Ms. Narcisse nor Mr. Thomas filed a pleading to modify custody after Ms. Narcisse's move, the trial court could have chosen to

alter the custody schedule in light of the move, but the Relocation Judgment clearly did not say anything about custody or the Consent Judgment. In fact, the Relocation Judgment did not even use the word "custody" or the phrase "Consent Judgment." As in *Belway*, though the move to Jacksonville made the custody schedule more difficult to enact, the Consent Judgment requiring Mr. Thomas to have time with Ma.T. and Mo.T. on alternating weekends remained in place.

Further, we disagree with Ms. Narcisse's contention that the Relocation Judgment was confusing and contradicted the consent judgment. The record reveals that after rendering its judgment denying Ms. Narcisse's Motion to Relocate, the trial court judge explained that she did not want to interrupt Ma.T.'s and Mo.T.'s school year by requiring them to move back to New Orleans in the middle of the school year, such that she would not require Ms. Narcisse to *relocate* back to New Orleans until after the school year. The trial court did not say that Ms. Narcisse would be able to avoid bringing Ma.T. and Mo.T. for Mr. Thomas' scheduled weekends. In fact, after hearing Ms. Narcisse's and Mr. Thomas' testimony about the relocation but prior to rendering the Relocation Judgment, the trial court emphasized that the Consent Judgment remained in place, stating "[t]hat [has not] been modified. . . . There is no judgment that has modified that. [That is] what you ought to be complying with and [that is] what I expect to be happening." Then, after orally rendering the Relocation Judgment, the trial court asked whether anyone had any questions, but no one responded. The record reveals that Ms. Narcisse's prior counsel prepared the Relocation Judgment. Ms. Narcisse could have and should have addressed any confusion over the alleged contradiction between the Consent Judgment and the Relocation Judgment with the trial court and with her prior counsel at either of these times, but she did not. Ms. Narcisse

could have even sought clarification of the alleged inconsistency between the Relocation Judgment and the Consent Judgment prior to Mr. Thomas' scheduled custody weekend, but she did not do so.

Moreover, in granting the Motion for Contempt, the trial court observed a contradiction in this matter. That is, Ms. Narcisse contended, in part, that the move to Jacksonville was beneficial due to her increased salary; however, when Ms. Narcisse did not bring Ma.T. and Mo.T. for their scheduled weekend with Mr. Thomas, Ms. Narcisse alleged that she could not bring them for financial reasons. We agree with the trial court that one cannot "take the argument that [Ms. Narcisse could not] afford [to bring the girls] as . . . reasonable grounds under the circumstances." To this end, we also note that at the time Ms. Narcisse did not bring Ma.T. and Mo.T. for the scheduled weekend, Ms. Narcisse only cited financial reasons to Mr. Thomas, not the alleged inconsistency between the judgments or her supposed belief that she no longer had to abide by the Consent Judgment.

Based on the above reasons, we agree with the trial court holding Ms. Narcisse in constructive contempt for willfully disobeying the Consent Judgment and for doing so intentionally, purposely, and without justifiable excuse. In sum, we conclude that the trial court did not abuse its discretion in finding Ms. Narcisse in contempt, and we affirm the trial court's Contempt Judgment.

## DECREE

For the foregoing reasons, we affirm the trial court's January 19, 2023 judgment, which denied Ms. Narcisse's Motion to Relocate, and we affirm the trial court's April 6, 2023 judgment, which granted Mr. Thomas' Motion for Contempt. We remand this matter for further proceedings consistent with this Opinion.

**AFFIRMED; REMANDED**